Patricia SCOLARO, et al., Petitioners,

v.

**DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS, Respondent,**

Rebecca Sinderbrand, et al., Intervenors.

No. 96–AA–1738.

District of Columbia Court of Appeals.

Argued Jan. 31, 1997.
Decided March 20, 1997.

Don W. Crockett, Washington, DC. for petitioners.

Kenneth McGhie, with whom Alice P. McCrory–Miller, Washington, DC, was on the brief, for respondent.

Daniel H. Bromberg, with whom Timothy B. Dyk, Barbara McDowell, and Brian Goebel, Washington, DC, were on the brief, for intervenors.

Arthur B. Spitzer, Washington, DC, filed a brief and participated at argument for The American Civil Liberties Union of the National Capital Area as amicus curiae.

W. Neil Eggleston and Laura S. Shores, Washington, DC, filed a brief for Rock the Vote, United States Public Interest Group, and the National Student Campaign for Voter Registration as amici curiae.

Before FERREN and RUIZ, Associate Judges, and GALLAGHER, Senior Judge.

FERREN, Associate Judge:

This case began with a student-community struggle over available parking places. It concerns the resulting desires of large numbers of Georgetown University students to

vote in local Advisory Neighborhood Commission (ANC) elections, and the corresponding efforts of many Georgetown community residents to stop them from doing so, on the ground that the students really reside elsewhere and thus are not "qualified electors" entitled to vote here. The Board of Elections and Ethics accepted large numbers of student voter applications based on each student's signature on the voter registration form just above a warning of severe criminal penalties for knowingly violating eligibility requirements listed there, including residency in the District of Columbia.

Petitioners include two local residents who lost ANC elections to Georgetown University students. Petitioners claim that (1) the voter registration form does not comport with the law; it effectively permits transients to register; (2) the Board in any event had an affirmative duty to scrutinize student applicants carefully, on its own initiative, in order to ferret out those who in fact permanently reside elsewhere; and (3) the Board arbitrarily refused to accept challenges to student voters at the polls, which the election statute permits. Petitioners accordingly ask us to set the two ANC elections aside and to order new ones, based on statutory requirements and constitutional due process.

We reject petitioners' first two contentions but agree that petitioners have proffered enough evidence of irregularities that, depending on the results of some preliminary fact-finding, they may be entitled to evidentiary hearings on their challenges. Because the Board lacks subpoena power necessary to assure attendance required for a productive hearing, we refer this proceeding to the Superior Court for hearing and fact-finding so that we shall be in a position to decide, after the court reports to us its findings and conclusions, whether petitioners are entitled to any relief.

## I.

Because there has been no administrative hearing or any record certified for our re-

view, we have relied, necessarily, on the transcript (proffered by intervenors) of the Board's December 4 and 13, 1996 hearing into the allegations of voter intimidation by petitioner Byrd, as well as on the parties' submissions by counsel, who serve not only as advocates but also as officers of the court. Our recitation of the facts, therefore, is tentative pending final review after fact-finding on remand.

In the spring of 1996, Georgetown University students organized "Campaign Georgetown," dedicated to involving students in the political process locally and nationally. By the end of June 1996, Campaign Georgetown claimed to have registered approximately 300 to 400 students to vote in the District of Columbia.

During the summer of 1996, the Georgetown ANC persuaded the Council of the District of Columbia to pass a bill amending D.C.Code § 40–303(e) (1990 Repl.), which had exempted full-time students who were not "legal resident[s] of the District of Columbia" from registering their automobiles with the District of Columbia Department of Motor Vehicles. Effective October 1, 1996, students living in the District who desired to hold residential parking stickers had to register their vehicles and pay the appropriate registration fee.

In September 1996, Campaign Georgetown continued its efforts to register students to vote in the District of Columbia. Also in September, three Georgetown students, intervenors Fogarty and Sinderbrand and a third student, Theo Jacobs, filed petitions for placement on the ballot as candidates for three ANC seats in the single member ANC Districts then served by Beverly Jost and Patricia Scolaro.[1] Scolaro challenged before the Board many of the signatures on both Sinderbrand's and Jacob's petitions and was successful in her challenge to Jacobs' petition.[2] The Board also sustained 13 of Scolaro's 23 challenges to Sinderbrand's petition, but this left 26 valid signature's for Sinderbrand—one more than required for a place on

---

1. Sinderbrand and Jacobs each filed a petition to run in Scolaro's district, ANC 2E03; Fogarty submitted a petition to run in Jost's district, ANC 2E05.

2. There is no indication that Jost challenged Fogarty's petition.

the ballot. None of Scolaro's challenges alleged that any of the student signers was not a legal resident of the District of Columbia, although she did challenge the signatures of several voters who allegedly resided outside the ANC district. Nor did Scolaro otherwise challenge either Sinderbrand or Jacobs as unfit candidates.

Sometime around September 10, 1996, petitioner Byrd drafted a flyer warning students that, if they registered in the District as voters, they would be required to pay income taxes in the District, they could lose grant money from their home states, they would have to change their driver's licenses from their home states to the District, and they would lose the benefit of any "Zone 2" stickers they had received and would have to reregister their cars in the District. On September 13, Dan Leistikow, a Campaign Georgetown organizer, filed a complaint with the Board alleging that the flyer raised questions of voter intimidation which the Board should investigate.

On October 23, Byrd sent the Board and other public officials a letter (on official ANC stationery) calling for investigation of the "900 Georgetown University Students" recently registered. The letter called for "an immediate and thorough joint investigation by all relevant DC agencies to prevent voting by unqualified electors." The letter also suggested the agencies that should participate and mentioned what they could do to determine whether the registered students had complied with District statutes governing the responsibilities of District residents.

On October 25, Board Chairman Benjamin Wilson replied to Byrd in writing that there was no legal basis for challenging registered students simply because they had failed to pay District taxes or to acquire District driver's licenses. Wilson also suggested that Byrd's letter "may be suggestive of voter intimidation" and that the Board would schedule a hearing on whether Byrd had violated the District's voter intimidation laws. See D.C.Code §§ 1–1316, –1318 (1992 Repl. & 1996 Supp.). Byrd responded on November 1 with a letter citing case law from other jurisdictions that Byrd believed supported

her position and demanding that Wilson retract his allegations.

By the end of October, Campaign Georgetown had registered another 600 to 700 students since spring, for a total of approximately 1,000. As election day drew nearer, Byrd consulted Alice McCrory–Miller, the Board's Acting Executive Director and General Counsel, on procedures for challenging registered voters. McCrory–Miller informed Byrd that because the 90–day cutoff for written challenges before election day had passed, see D.C.Code § 1–1311(e)(5)(A) (1996 Supp.), voters could be challenged only by duly appointed poll watchers when the voters attempted to cast their ballots. See D.C.Code § 1–1313 (1996 Supp.). Poll watchers for Byrd, Jost, and Scolaro accordingly began to organize their efforts to challenge student voters. The watchers prepared two lists of voters they wished to challenge: recent registrants listed in the 1995–1996 Georgetown University Telephone Directory (the 1996–1997 Directory was not then available) for whom a "permanent address" outside the District was supplied, and recent registrants from a list of Georgetown freshmen. The poll watchers also prepared a large number of challenge forms with a pre-printed challenge: "student has not rebutted presumption of home-state domicile with specific evidence of new domicile in D.C."

On the morning of November 4, 1996, flyers were distributed in Byrd's ANC district supporting a write-in candidacy for Georgetown University faculty member Walter Benson. The flyer referred to Byrd's correspondence and to the allegations of voter intimidation. That evening, to counteract this flyer, Byrd distributed copies of her correspondence with the Board to all the homes in her district. Also on November 4, Byrd delivered a letter to the Board members notifying them that many voters would be challenged and requesting additional resources for Precinct 6 to alleviate the difficulties the challenges might cause.

On November 5, the morning of the election, Board Chairman Wilson faxed a letter to Byrd stating that the Board properly had construed its duty under the statute and that there would be no changes affecting proce-

dures or personnel at Precinct 6. Wilson also advised that challenges could be made only by designated poll watchers and that the burden of proof in each instance would be on the challenger.[3]

What happened during the course of Election Day is subject to considerable debate among the parties. Barbara Zartman apparently made the first voter challenge at approximately 7:30 a.m. against Brian O'Connor, a Georgetown student. According to petitioners, Zartman presented her challenge to Precinct Captain Sidney Spencer, pointing to a "permanent address" listed for O'Connor as Homesdale, New Jersey in the Georgetown Directory. Spencer then questioned O'Connor and, after discussion, decided to sustain the challenge. While Spencer was filling out the challenge form, Board Member Valerie Burden and poll watchers for Fogarty, Sinderbrand, and Benson intervened. Burden allegedly informed Spencer that a student could defeat a challenge based on the Georgetown Directory simply by declaring the District to be his or her true residence. Burden then escorted Spencer to a nearby phone, where they called Alice McCrory–Miller. McCrory–Miller allegedly instructed Spencer to deny the challenge. Zartman then apparently spoke to McCrory–Miller and argued that this amounted to little more than "voting on the honor system." McCrory–Miller allegedly agreed that was true. After this conversation, Spencer allegedly told Zartman that "his hands were tied" and that he would deny this challenge and all subsequent challenges. Spencer then apparently altered the challenge form to reflect that he denied the challenge, with the notation "per disc. 7:30 a.m. with Alice Miller."

Although petitioners consistently have alleged that no one has disputed the foregoing account, there was significant contradictory testimony about the O'Connor challenge at the December 1996 Board hearing on the voter intimidation allegations against petitioner Byrd.[4] At that hearing, counsel for Dan Leistikow stated that his side disputed Barbara Zartman's recitation of events. Spencer testified that McCrory–Miller had not ordered him to do anything but instead had said "it's your call." Alexandra Carter, a Fogarty poll watcher, testified that Spencer had not sustained the first challenge. Brian O'Connor testified that, although Spencer had sustained the first challenge, O'Connor denied ever living at the New Jersey address in the Directory and insisted that he permanently resided in the District.[5] O'Connor also maintained that Spencer had not even allowed him to make his argument against Zartman's challenge until Burden intervened.

During the rest of the day, November 5, Zartman and other poll watchers for petitioners attempted to challenge students named on their lists. They apparently were hindered, however, by the crowded conditions and noise. As a result, only 368 of the 800 or so challenges that petitioners had contemplated making were actually made. Nearly all the challenge forms contained the same preprinted ground for challenge—a "presumption of home-state domicile"—although some challenges were written by hand and a few contained notations such as "permanent residence in Florida," "student lists a permanent New Jersey address," and "[voter] may have a voting residence in a state and legal domicile there." Petitioners allege that they initially attempted to provide more detail for their challenges (which would have augmented the preprinted "presumption" language) but that the press of the crowds, the need to accelerate the process, and the apparent futility of their challenges—because the Precinct Captain declared he would deny all subsequent challenges—caused them to abandon these efforts.

Petitioners, through Barbara Zartman's Declaration, see *supra* note 4, allege three

3. Petitioners also cite a letter from General Counsel McCrory–Miller to an ANC candidate in another District to support petitioners' claim that the Board had treated petitioners in a more hostile manner, and imposed on them a higher burden of proof, than the Board had in dealing with challenges in other ANC districts.

4. It is important to note that the Zartman Declaration, a series of affidavits filed with this court, does not confirm all of petitioners' claims about what happened.

5. It is worth noting that other individuals testified that there were inaccuracies in the Directory.

additional irregularities. First, they say that poll watchers for Sinderbrand, Fogarty, and Benson engaged in inappropriate electioneering activities, hectoring the other poll watchers and helping student voters circumvent the poll watchers.

Second, Zartman claimed to have seen Board member Valerie Burden engage in similar inappropriate behavior. Specifically, Zartman averred that Burden had spoken at the polls with voters, "belittl[ing] the challenge made by incumbent commissioners" and saying she "shared the Board's belief that our position was 'ridiculous.'"

Finally, Zartman reported that voters who voted by "special ballot"[6] were taken away from the regular voting area to vote. When Zartman asked for an opportunity to challenge special ballot voters on her list, McCrory–Miller allegedly informed her that she could do so later when the special ballots were examined and counted.

During the course of the day, delays of up to two hours occurred. Board Chairman Wilson visited Precinct 6 for several hours to observe conditions first hand. There are no allegations, however, that any of his on-site actions was improper.

On November 6, the day after the election, Zartman informed the Board that she wished to review the special and absentee ballots. McCrory–Miller initially agreed to allow Zartman to review those ballots on November 13. Unfortunately, the special ballots were accidentally commingled with the regular ballots, and thus Zartman did not have an opportunity to review the ballots until the next day, after the Board had re-sorted them. Zartman reviewed the ballots and asked how to challenge them. McCrory–Miller allegedly told her that all challenges had to have been made on Election Day, as the Board had no proceedings for post-election challenges. Zartman protested that, be-

cause voters by special ballot had been segregated from regular voters and because their names had not been called for the benefit of the poll watchers, a challenge at the polls had been impossible to accomplish. She claimed a denial of due process.

On November 15, 1996, the Board counted all the absentee ballots and all the special ballots not eliminated for reasons independent of Zartman's challenges. On November 18, the Board certified the election with the following results: Fogarty over Jost by 235 votes, Sinderbrand over Scolaro by five votes, Byrd over Benson by 180 votes. On November 19, Scolaro filed a request with the Board for a recount. The Board conducted a recount in the presence of Scolaro and Sinderbrand on December 2, and determined that Sinderbrand in fact had won by three votes.

On November 14, McCrory–Miller notified Byrd that the Board would hold a hearing based on Leistikow's September 13 complaint of voter intimidation, in order to determine whether the Board should refer the matter to the United States Attorney.[7] On November 23, petitioners filed in the U.S. District Court for the District of Columbia a complaint alleging the Board had violated their civil rights under 42 U.S.C. § 1983 (1994), and requesting an injunction against the Board to prevent a hearing in the Byrd matter. On November 25, petitioners filed in this court a petition for review under D.C.Code § 1–1315(b), but asked us to stay the matter until resolution of the federal proceeding. We did so. On November 27, Judge Oberdorfer denied petitioners' request for a temporary restraining order against the Board in the Byrd matter and stayed the federal proceeding pending resolution of the "state court proceedings" in this court. *See Scolaro v. District of Columbia Bd. of Elections & Ethics*, 946 F.Supp. 80 (D.D.C.1996) (Oberdorfer,

6. *See* D.C.Code § 1–1311(i)(4)(C) (1996 Supp.) ("The ballot of each person who files an election day change of address at a polling place shall be stamped 'special' and placed in a sealed envelope.").

7. The Board, of course, does not have the power to pursue criminal violations of the District's election laws; all prosecutions are conducted by

the Office of the United States Attorney for the District of Columbia. *See generally* D.C.Code § 23–101(c) (1996 Repl.). Petitioners argue that the Board, therefore, had no authority to hold a hearing into these allegations, and that the holding of such an unprecedented, extra-legal hearing demonstrated the Board's bias against petitioners.

J.). On November 29, petitioners asked us to lift the stay on this proceeding and moved to expedite it. We granted both requests.

On December 3, and again on December 13, the Board held its hearing on Leistikow's complaint against Byrd. Chairman Wilson and Board member Norma F. Leftwich participated; Board member Burden recused because she had been "on duty" for the Board in Precinct 6 on election day. The Board decided to refer the matter to the United States Attorney's Office. During the course of the hearing, Chairman Wilson commented on the Board's policy governing challenges at the polls:

> [I]f you are in the [voter registration] book at the address that you give [to the election official], you are in; and if somebody challenges you, and you are in the book at that address, that challenge, it has been our practice not to uphold.
>
> Now, if you are in the book and there presumably is some evidence that you now live in Maryland or Pennsylvania or Texas, that would be an unusual situation, but that might be upheld because that would be something different; but that is what I understood happens.

On December 24, this court ruled on the following motions in the present proceeding: we granted Fogarty's and Sinderbrand's motions to intervene; we denied the motion of the Georgetown University Student Association to intervene; and we granted the American Civil Liberties Union, Rock the Vote, United States Public Interest Group, and the National Student Campaign for Voter Registration leave to file as amici curiae. We also granted petitioners' motion to stay the election result pending our resolution of this case. Intervenors promptly filed a motion for reconsideration. On January 7, 1997, we lifted our stay and thus allowed Fogarty and Sinderbrand to represent ANCs 2E05 and 2E03, respectively, until this case is finally decided.

## II.

Petitioners press three principal contentions:

1. The Board's voter registration form is invalid under the election statute, D.C.Code § 1–1311(a)(2) (1996 Supp.), and the Constitution.

2. In allowing hundreds of local college students to register to vote, the Board failed to perform its statutory duty under § 1–1302(16) and § 1–1311(a) of the election statute to screen out, on its own initiative, unqualified electors—a failure that resulted in the unconstitutional dilution of petitioners' votes.

3. By allowing virtually all student registrants to vote in spite of petitioners' efforts to challenge their voter qualifications, the Board denied petitioners their constitutional right to due process.[8]

## III.

Seven days after the Board certified the elections of Rebecca Sinderbrand and James Fogarty as Commissioners for ANCs 2E03 and 2E05, respectively, petitioners sought review of those elections directly in this court pursuant to D.C.Code § 1–1315(b), which provides:

> Within 7 days after the Board certifies the results of an election, *any person who voted in the election may petition the District of Columbia Court of Appeals to review such election.* In response to such a petition, the Court may set aside the results so certified and declare the true results of the election, or void the election in whole or in part. To determine the true results of an election *the Court may order a recount or take other appropriate action,* whether or not a recount has been conducted or requested pursuant to subsection (a) of this section. *The Court shall void an election only for fraud, mistake,* the making of expenditures by a candidate, or

---

**8.** Petitioners also fault the Board for conducting the public hearing into petitioner Byrd's alleged campaign of voter intimidation; they contend it "further tainted the election in Precinct 6." See *supra* note 7. We note that Byrd won reelection to her seat as ANC Commissioner in district 2E04, and that she therefore has no standing to challenge the results in ANC districts 2E03 and 2E05 at issue here. *See* D.C.Code § 1–1315(b) (petitioner must be a "person who voted in the election"). We accordingly order Byrd dismissed as a party-petitioner.

the willful receipt of contributions in violation of the District of Columbia Campaign Finance Reform and Conflict of Interest Act (D.C.Code § 1–1401 et seq.), *or other defect, serious enough to vitiate the election as a fair expression of the will of the registered qualified electors voting therein.* If the Court voids an election it may order a special election, which shall be conducted in such manner (comparable to that prescribed for regular elections), and at such time, as the Board shall prescribe. The decision of such Court shall be final and not appealable.

(Emphasis added.)

■ Our jurisdiction under § 1–1315(b) to review an election is independent of our general jurisdiction to review "orders and decisions" of public agencies under D.C.Code § 11–722 (1995 Repl.), and thus it is not subject to the usual D.C. Administrative Procedure Act limitation on our jurisdiction to the review of "contested cases." *See White v. District of Columbia Bd. of Elections & Ethics,* 537 A.2d 1133, 1134 n. 2 (D.C.1988) (concluding that § 1–1315(b) proceeding "not a 'contested case' "); *see also Pendleton v. District of Columbia Bd. of Elections & Ethics,* 449 A.2d 301, 303–306 (D.C.1982); *cf. Gollin v. District of Columbia Bd. of Elections and Ethics,* 359 A.2d 590, 595 (D.C. 1976). We have said that § 1–1315(b)'s statutory predecessor, D.C.Code § 1–1111(b) (1973), "confer[red] broader authority upon the court" than our traditional "substantial evidence" review applicable in contested cases. *Pendleton,* 449 A.2d at 306 (citing *Gollin,* 359 A.2d at 595 ("reliable evidence" test)). We do not, however, explore here the differences between our § 1–1315(b) authority and our usual "contested case" review. Petitioners' first two contentions present pure questions of law based on uncontested facts and thus concern no issues that require a hearing that would implicate an evidentiary standard of review. As to petitioners' third contention, until there is an evidentiary hear-

ing to yield findings of fact and related conclusions of law, we shall have no basis for knowing whether there are any meaningful differences between standards of review that could have a bearing on this case.

## IV.

Petitioners first challenge the Board's voter registration form. According to D.C.Code § 1–1311(a) (1996 Supp.):

(a) No person shall be registered to vote in the District of Columbia unless:

(1) *He or she meets the qualifications as a qualified elector* as defined in § 1–1302(2);

(2) *He or she executes an application to register to vote* by signature or mark (unless prevented by physical disability) on a form approved pursuant to subsection (b) of this section or by the Federal Election Commission *attesting that he or she meets the requirements as a qualified elector,* and if he or she desires to vote in party election, this form shall indicate his or her political party affiliation; and

(3) The Board approves his or her registration application as provided in subsection (e) of this section. (Emphasis added.)

Petitioners contend that the Board's voter registration form fails to require the registrant to "attest[ ] that he or she meets the requirements as a qualified elector." D.C.Code § 1–1311(a)(2) (1996 Supp.).

According to D.C.Code § 1–1302(2) (1992 Repl. & 1996 Supp.), with an exception not relevant here:

[T]he term "qualified elector" means a citizen of the United States:

(A) Who resides[ [9] ] or is domiciled in the District, has maintained his or her residence in the District for at least 30 days preceding the next election, and who does not claim voting residence or right to vote in any state or territory;

---

9. The election statute defines "residence" in D.C.Code § 1–1302(16)(A) as follows:

The term "residence," for purposes of voting, means the principal or primary home or place of abode of a person. Principal or primary home or place of abode is that home or place

in which the person's habitation is fixed and to which a person, whenever he or she is absent, has the present intention of returning after a departure or absence therefrom, regardless of the duration of the absence.

(B) Who is, or will be on the day of the next election, 18 years old; and

(C) Who is not mentally incompetent as adjudged by a court of competent jurisdiction.

No one disputes that the Board's registration form has been approved not only by the Board but also by the Federal Elections Commission—an approval, expressly recognized by statute, that arguably is enough to confirm that the form complies with the law. *See id.* § 1–1311(a)(2) (quoted in the text above). We do not pause to address that argument, however, because we conclude, independently, that the form meets all legal requirements.

The form begins with instructions at the top, including:

**To register to vote in D.C., you must:**

- be a U.S. citizen
- be a D.C. resident
- be at least 18 years old on or before the next election
- not be in jail for a felony conviction
- not have been judged "mentally incompetent" by a court of law
- not claim the right to vote anywhere outside D.C.

Lower down, in box ten, the form states:

**Voter Declaration**—read and sign below

I swear or affirm that:

- I am a U.S. citizen
- I live in the District of Columbia at the address (# 3) above
- I will be at least 18 years old on or before the next election
- I am not in jail on a felony conviction
- I have not been judged "mentally incompetent" in a court of law
- I do not claim the right to vote anywhere outside D.C.

_____ _____
Signature Date

**WARNING: If you sign this statement even though you know it is untrue, you can be convicted and fined up to $10,000 and/or jailed for up to five years.**

On its face, therefore, the form advises anyone who wishes to vote that he or she must be a D.C. "resident." It further requires an applicant to affirm that he or she "live"[s] in the District and does "not claim the right to vote anywhere outside D.C.," not merely that the applicant is not registered elsewhere. Finally, the form warns the would-be registrant of substantial penalties for false statements.

■ Petitioners' principal argument that the form does not comply with the statute centers on the registrant's signing a "voter declaration" in box ten of the form that he or she "live[s]" in the District at a specified address, rather than "resides or is domiciled" here, as § 1–1302(2)(A) requires for a "qualified elector." Petitioners point to Maryland's and Virginia's use of the word "resident" on their voter registration forms and argue that the Board's use of "*live* in the District" would permit a transient truthfully to sign the form.

Petitioners' argument is unpersuasive. The form clearly states, at the top, a legal requirement: "To register to vote in D.C., you must ... be a D.C. resident" and "must not claim the right to vote anywhere outside D.C." Because the form's instructions, therefore, lay out a legal predicate for registration, anyone reading and signing the form would know that the words "live in," taken in the earlier-described context, have to mean "resident of"—as defined under District of Columbia law—and nothing less. We do not believe a prospective voter reasonably can infer from box ten of the registration form that the words "live in" may be interpreted casually to dilute a fundamental legal requirement announced in the instructions at the top of the form.

Even if a voter applicant were to wonder whether the words "live in" could be used to define "resident," rather than the other way around, we believe the requirement that the applicant "must not claim the right to vote anywhere outside D.C." makes especially clear that the right to vote is limited to persons (otherwise qualified) who "live" here as legal "residents," not merely as temporary dwellers. Furthermore, when one focuses on the fact that a single voter registration authorizes participation in all public elections—

for the President as well as for Mayor, Council, and ANC representative—we do not believe a voter applicant, knowing he or she must be a "D.C. resident," would be misled by the Board's form into believing that the District (or any jurisdiction) would permit someone to vote without having a permanent residence here in the common-sense way the statute itself defines "residence" for voting purposes: a "principal or primary home" in the District "with the present intention of returning" whenever absent. D.C.Code § 1–1302(16)(A); see *supra* note 9.

In sum, the voter registration form puts a prospective voter on notice that he or she "must ... be a D.C. resident," *as defined by law,* not as defined by someone who would use the words "live in" alone—wholly out of context—to suggest a watered-down idea of residency for voter registration purposes in Presidential, Mayoral, Council, and ANC elections.

### V.

Petitioners next argue that the Board has an affirmative responsibility under § 1–1311(a) (quoted above in Part IV.)—without waiting for challengers—to screen out unqualified electors, particularly university students who, presumably, are permanent residents of other jurisdictions.

■ We do not question that election officials may take a reasonable look behind a declaration of residency on a voter's registration to determine whether "actual facts and circumstances," *Carrington v. Rash,* 380 U.S. 89, 95, 85 S.Ct. 775, 779, 13 L.Ed.2d 675 (1965), confirm the voter's declaration. On the other hand, we see no compelling governmental interest that would justify placing a special discriminatory burden on students or any other group to justify their signed declarations of residency (and compliance with other specified voter qualifications). *See Dunn v. Blumstein,* 405 U.S. 330, 337, 343–44, 92 S.Ct. 995, 1000, 1003–04, 31 L.Ed.2d 274 (1972) (applying heightened scrutiny to voting rights cases and mandating that any residency test be "appropriately defined and uniformly applied"); *Williams v. Salerno,* 792 F.2d 323, 328 (2d Cir.1986) (holding presumption that dormitory cannot be voter

"residence" unconstitutional); *Whatley v. Clark,* 482 F.2d 1230, 1234 (5th Cir.1973) (holding rebuttable presumption of non-residency for students unconstitutional); *Levy v. Scranton,* 780 F.Supp. 897, 903 (N.D.N.Y. 1991) (holding presumption that on-campus living quarters cannot be "residence" for voting purposes unconstitutional); *United States v. Texas,* 445 F.Supp. 1245, 1257, 1259 (S.D.Tex.1978) (three-judge panel) (holding special student questionnaire and rebuttable presumption of student non-residence unconstitutional), *aff'd mem. sub nom. Symm v. United States,* 439 U.S. 1105, 99 S.Ct. 1006, 59 L.Ed.2d 66 (1979); *Frazier v. Callicutt,* 383 F.Supp. 15, 19–20 (N.D.Miss.1974) (finding violation of due process where student voter registration applications singled out for special inquiry and review); *Sloane v. Smith,* 351 F.Supp. 1299, 1304–05 (M.D.Pa.1972) (holding required proofs of residence imposing higher burden on students unconstitutional); *Bright v. Baesler,* 336 F.Supp. 527, 534 (E.D.Ky.1971) (rejecting special student questionnaire as unconstitutional); *Johnson v. Darrall,* 337 F.Supp. 138, 139 (S.D.Ind. 1971) (holding presumption of student non-residence unconstitutional). *But see Auerbach v. Rettaliata,* 765 F.2d 350, 355 (2d Cir.1985) (holding New York law that students and other classes of "transients" shall be subject to special voter registration inquiry, without need for particular challenge, not unconstitutional on its face); *Lloyd v. Babb,* 296 N.C. 416, 251 S.E.2d 843, 864–65 (1979) (finding permissible special questionnaire and rebuttable presumption of student non-residency).

■ In any event, however far the Board *may* go, constitutionally, to screen out non-resident voter applicants or registrants, this is not to say the Board *must* make an up-front, pre-registration effort to scrutinize a particular group more carefully than it looks at other would-be voters. "Insofar as the Board's legal conclusions are concerned, we must defer to its interpretation of the statute which it administers ... so long as that interpretation is not plainly wrong or inconsistent with the legislative purpose." *Allen v. District of Columbia Bd. of Elections & Ethics,* 663 A.2d 489, 495 (D.C.1995)

(§ 1–1315(b) case). Even without according such deference, however, we can discern no statutory duty under the provisions petitioners cite, D.C.Code §§ 1–1302(16)(E),[10] 1–1311(a) (quoted earlier in Part IV.), that would compel the Board to give students a closer look than anyone else when they attempt to register to vote. We believe the Board can lawfully place the burden of challenging registered voters on others.

## VI.

Having concluded that the voter registration form passes muster, and that the Board had no obligation to question student applicants specially, in order to ferret out non-resident registrants, we are satisfied that this case must turn on factual findings about the challenged voter registrants themselves. We now address that inquiry beginning with the pertinent statutory provisions.

## A.

When a petition under § 1–1315(b) claims unlawful voter registration, two provisions of the elections statute are likely to receive scrutiny. The first, D.C.Code § 1–1311(e)(5)(A), permits a duly registered voter to challenge voter registrations during the period up to 90 days before the election. Under this provision, the losing party—registrant or challenger—has the right of appeal to the Board, but no further appeal is allowed.[11]

The second provision at issue, § 1–1313(c) & (d), permits voter registration challenges at the polls. Under this regime, a losing registrant may appeal to the Board and, if necessary, to the Superior Court; but a challenger who loses at the precinct level (or loses before the Board when a rejected registrant successfully appeals the Precinct Captain's decision) has no statutory right of appeal to the Board or to any court.[12]

The question, then, is how this court is to review an allegedly tainted election under § 1–1315(b) given this statutory scheme for challenging registered voters, particularly when a losing challenger at the polls has no statutory right to a Board hearing to make a reviewable record after losing informally at the precinct level.

■■■ Because the right to vote is a fundamental constitutional right, *see Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d

---

**10.** D.C.Code § 1–1302(16)(E) provides:

> No person shall be deemed to have gained or lost a residence by reason of absence while employed in the service of the District or the United States governments, while a student at any institution of learning, while kept at any institution at public expense, or while absent from the District with the intent to have the District remain his or her residence. If a person is absent from the District, but intends to maintain residence in the District for voting purposes, he or she shall not register to vote in any other state or territory during his or her absence.

**11.** When a duly registered voter wishes—"not later than 90 days" before an election—to object to a particular voter's registration, the Board must notify the registered voter of the challenge, allow the registrant to respond, and make a decision within ten days of that response. D.C.Code § 1–1311(e)(5)(A), (C) (1996 Supp.). The decision by the "Board's chief voter registration official" is then mailed "to the challenged registrant and the person who filed the challenge." *Id.* § 1–1311(e)(5)(C). "[A]ny aggrieved party may appeal" that determination to the Board, which "shall conduct a hearing and issue a decision within 30 days of receipt of the written notice of appeal." *Id.* If the challenged voter

loses before the Board and thus has his or her registration cancelled, that voter "shall not be eligible to vote except by reregistration," *id.* § 1–1311(e)(6); the deregistered voter thus has no further right of appeal. If the challenger loses before the Board, that, too, is the end of the appellate line.

> In contrast, when an application to register to vote is rejected, the applicant may request a hearing before the Board, where "the applicant and any interested party may appear and give testimony." D.C.Code § 1–1311(f). Any party "aggrieved" by the Board's decision may appeal that decision to the Superior Court, but no further. *Id.*

**12.** Under D.C.Code § 1–1313(d) (1996 Supp.), if "the official in charge of the polling place" (i.e., the Board-appointed Precinct Captain) "reasonably believes" the registrant "is unqualified to vote," the registrant may cast a "challenged" ballot, *id.*, and invoke the right to an evidentiary hearing before the Board, *see id.* § 1–1313(e). After the Board's decision, "[a]ny aggrieved party," *id.*—defined by the Board in 3 DCMR § 722.5 (1994) to mean only a rejected "voter"—may appeal the Board's ruling to the Superior Court, the decision of which shall be "final and not appealable." D.C.Code § 1–1313(e).

481 (1964)—which includes the right of qualified voters not to have their franchise diluted by unqualified voters, *see id.* at 17, 84 S.Ct. at 534—one can argue quite persuasively that the elections statute should be construed to authorize a challenger-initiated hearing as of right, in order to preclude a due process attack. Rather than deal directly with this constitutional question, we are satisfied that the provision authorizing our review, § 1–1315(b), in itself provides implied authority for such a hearing. That subsection authorizes this court to take "appropriate action" to determine "the true results of an election"—clearly a mandate to require the kind of evidentiary hearing (if not otherwise required) that is necessary to get at the truth of alleged voter registration violations and to make our review possible as a result. In a case where a challenger has lost at the precinct level, an evidentiary hearing usually will be essential for necessary fact-finding before an election can be certified.

■ We therefore conclude that, when a challenger loses a voter registration challenge before the Precinct Captain and wants a review of that decision, the challenger—as a consequence of our authority to review elections under § 1–1315(b)—must be afforded an evidentiary hearing unless the issues raised can be disposed of directly by this court as a matter of law, without fact-finding—as we do here with respect to the first two issues raised in this appeal. *See Hawkins v. Butler–Truesdale*, 584 A.2d 1241, 1243–44 (D.C.1990) (finding no violation of law requiring "non-partisan" Board of Education election where candidate was captain of ward Democrats and claimed party endorsement); *Leckie v. District of Columbia Bd. of Elections & Ethics*, 457 A.2d 388, 390 (D.C.1983) (concluding that registered voter in primary election may write-in candidate's name even if candidate does not belong to party conducting election).

### B.

The Board agrees that petitioners have the right to an evidentiary hearing; it says that the hearing would be available under the Board's regulations; and thus it concludes that this court should withhold review because petitioners have failed to exhaust two administrative remedies: their respective rights to challenge before the Board (1) voter registration during the period up to 90 days before the election, *see* D.C.Code § 1–1311(e)(5)(A), and (2) voter registration thereafter, pursuant to D.C.Code § 1–1313(c) & (d).

■ To the extent that petitioners have challenged voters at the polls who were on the rolls at least 90 days before the date of the election, the Board arguably has a point, but on examination it disappears. The respective rights to challenge voters who have registered more than 90 days before the election and, later, to challenge voters at the polls are altogether distinct rights with different prescribed statutory remedies. We see no basis for ruling that failure to challenge, under § 1–1311, all voters who have been registered more than 90 days before the election forecloses a challenge to the same voters later at the polls, pursuant to § 1–1313, when time may have yielded additional information useful to the challenge. It may be true that earlier challenges under § 1–1311, rather than last minute objections under § 1–1313, would clarify the situation early enough to prevent an eventual rush of challenges at the polls which, if handled improperly, would require the voiding of an election that otherwise could have been saved through more leisurely processing of challenges. That possibility, however, is not enough to withhold the separate statutory right to challenge registered voters on election day.

■ Petitioners' principal concern here, however, appears to be their challenges at the polls to hundreds of late registered student voters—challenges which Board members and officials themselves allegedly frustrated and for which no administrative hearing is statutorily prescribed for a losing challenger, other than the decision the Precinct Captain must make on the spot. *See* D.C.Code § 1–1313(e); 3 DCMR § 722.5. Thus, there is no administrative remedy to exhaust.

The Board responds to this argument by telling this court that, even without an explic-

it statutory remedy, petitioners could have— and thus should have—filed, before the election results were certified, an administrative complaint pursuant to 3 DCMR §§ 400–415, the election statute regulations adopted pursuant to D.C.Code § 1–1306(a)(14). Specifically, 3 DCMR § 400.1 says the regulations govern (among other things) "alleged violations of the District of Columbia Election Act, as amended." These regulations, however, are procedural rules, such as those governing hearings applicable when a substantive right to a Board hearing is otherwise available; nothing in the regulations purports to afford an evidentiary hearing to a losing challenger to registered voters at the polls. In view of the highly detailed elections statute, which does not specify an appeal right (other than to this court under § 1–1315(b)) for challengers to registered voters, we cannot say that petitioners had any solid basis for inferring the right to file an administrative complaint with the Board—at least not solid enough to be held legally accountable for failure to exhaust such a remedy. True: the Board might have agreed to entertain such a petition, if filed, before certifying the election. But the statute and regulations do not provide for a Board hearing under these circumstances, and petitioners' failure to test the Board's willingness to conduct one is excusable absent a discernable hearing as of right, not of grace. *See, e.g., Darby v. Cisneros,* 509 U.S. 137, 146–47, 113 S.Ct. 2539, 2544–45, 125 L.Ed.2d 113 (1993) (concluding that only those remedies "expressly prescribed by statute or agency rule" subject to exhaustion requirement).

Petitioners, therefore, are entitled to a fact-finding hearing. Thus, the question is: in the absence of a hearing record, is there any impediment to our remanding the proceeding to the Board for an evidentiary hearing? Or, as petitioners request, should this court "appoint a special master" (perhaps the Superior Court) to resolve the voter challenges?

### C.

We consider, first, the appropriateness of remanding the proceeding to the Board. The Board has three members, *see* D.C.Code § 1–1303(a) (1992 Repl.), and an Executive Director, *see* 3 DCMR § 100.5, all but one of whom petitioners claim unlawfully interfered with or improperly administered the voting process. Petitioners therefore contend the Board is tainted for remand purposes—a contention premised for the most part on allegedly improper actions by one Board member, Valerie Burden, and Acting Executive Director and General Counsel, Alice McCrory–Miller, in preventing the Precinct Captains from entertaining petitioners' voter challenges at the polls on election day.

McCrory-Miller, however, is not on the Board; she would not hear a remand proceeding. Of the three Board members, moreover, Norma Leftwich has not been accused of any impropriety. The remand issue, therefore, is limited to the questions raised about Chairman Wilson and Board member Valerie Burden.

Although petitioners have claimed that Board Chairman Wilson was party to erroneous legal rulings and should not have permitted the Byrd hearing, he has not been accused of any improper interference with challenges at the polls. Petitioners stress that he was present at Precinct 6 on election day for several hours, but they do not allege that he did anything untoward there. We have no basis in the proffers before us, therefore, to question Chairman Wilson's ability to wear an adjudicator's hat to hear the evidence and make fair-minded, unbiased findings and conclusions in this case—subject, of course, to this court's review. The possibility that Chairman Wilson may have expressed legal views at odds with those we express here (we cannot say whether he did or not) in no way indicates that he could not fairly apply the law as given to him.

Valerie Burden, who appears to have been actively involved in the rulings on Precinct 6 challenges, recused herself from participating in the Byrd hearing because of her activity at the precinct, and, presumably, would do so for the same reason in this case. That, however, would still leave a Board majority available to hear petitioners' challenges if we were to say the Board should do so to facili-

tate the fact-finding required for our § 1–1315(b) review of the ANC elections.[13]

 We cannot be satisfied, however, that the Board should conduct the required evidentiary hearing—not because the Board is tainted, as petitioners would have it, but because the Board lacks subpoena power that may be essential to assure a satisfactory hearing. For an evidentiary hearing on a voter registration challenge to produce adequate fact-finding, the challenged voters must appear. Such voters have no incentive to do so upon request, however, and the Board's subpoena power—limited to matters concerning campaign finance[14]—cannot be used to compel anyone to attend the kind of hearing required in this case. Nor can a voter's refusal to honor a hearing notice be construed in a challenger's favor, since we have said on another occasion that there can be many reasons, some entirely unrelated to the challenge, that cause a notified voter not to appear. *See Allen,* 663 A.2d at 498 n. 15.[15]

Accordingly, since this court itself is not equipped to hold an evidentiary hearing to find facts, our only recourse is to appoint a special master to do so in aid of our § 1–1315(b) jurisdiction. On occasions when we have been confronted with a similar problem we have enlisted the good offices of the Supe-

rior Court, notably in cases where we have been charged under D.C.App. R. 49(d) with entertaining a petition from the Committee on Unauthorized Practice of Law,[16] or have been asked by the Board on Professional Responsibility to hold a lawyer in contempt for failure to comply with a suspension order.[17] We therefore propose to obtain the Superior Court's assistance here, not only because that court is ideally equipped to conduct the required hearing and make appropriate findings and conclusions, but also because Superior Court judges are experienced with the elections statute. As we have recognized, they are authorized to hear election appeals when registered voters have been stricken from the rolls and have wished to contest the Board's ruling. *See* D.C.Code §§ 1–1311(e), (f), 1–1313(e); 3 DCMR § 722.5.

 The next phase of this election review, therefore, must be referred to the Superior Court as a special master to conduct one or more evidentiary hearings, findings of fact, and conclusions of law. The proceedings shall be governed by Super. Ct. Civ. R. 53(c), (d), and (e)(1) governing assignments to masters. Presumably, we could limit the referral to fact-finding, but the parties will

---

**13.** For official business a Board quorum is two members. *See* 3 DCMR § 102.1. Although the election statute permits the Board "to hear any case before it ... by 1 member panels," we need not consider that possibility here.

**14.** The Board's own subpoena power is limited to subpoenas issued by the Director of Campaign Finance, approved by the Board, to carry out the purposes of that office. *See* D.C.Code § 1–1432 (1992 Repl.); 3 DCMR §§ 3306–3307.

**15.** According to the *Allen* footnote:

The persons whose right to vote was challenged were given notice.of the Board hearing one week in advance. Petitioners claim that the failure of each to appear constitutes an admission or quasi-admission of non-residency, or at least strengthens their challenge to the non-appearing voter's qualifications.

The record does not disclose whether these individuals were employed, or even in the Washington, D.C. area, at the time of the hearing. Many citizens would doubtless be reluctant, more than a month after the election, to take a day off from work or from other activities to attend such a proceeding. There might be a variety of reasons for not attending, and the

notion that a voter stayed away because he or she had no response to petitioners' allegations is altogether speculative. Not a single one of the nine voters who were initially challenged appeared at the hearing. Petitioners have now effectively conceded that they had no case as to five of them. We conclude that it was reasonable for the Board not to accord any weight to these individuals' non-attendance.
663 A.2d at 498 n. 15.

**16.** *See, e.g., In re Burton,* 614 A.2d 46, 47 (D.C. 1992) (designating Superior Court judge "as a member of this court to determine, after a hearing, whether respondent should be held in contempt" of order barring unauthorized practice of law).

**17.** *In re Cummings,* 471 A.2d 254, 257 (D.C. 1984) (referring factual issues in contempt proceeding concerning alleged unauthorized practice of law by suspended District of Columbia lawyer to Superior Court for evidentiary hearing as special master, based "upon the court's inherent power to provide itself with appropriate instruments which it may require to perform its duties").

present their challenges and responses in a legal context, and we shall benefit from the trial court's legal conclusions as to whether, in light of its findings and the applicable statute, any relief would be appropriate or required. We shall wait until we receive the court's findings and conclusions to decide our standard of review for its fact-finding, in light of its dual role as surrogate for the Board and master for this court. We shall, of course, review the conclusions of law de novo in keeping with our assigned responsibility under § 1–1315(b).

Before addressing how the trial court shall proceed here, we believe it is important to explain briefly how challengers and the Board should deal in the future with cases subject to this court's review under D.C.Code § 1–1315(b).

█ We concluded earlier that a challenger who loses before a precinct captain is entitled to an evidentiary hearing as a necessary basis for this court's direct review under § 1–1315(b). Therefore, until there is remedial legislation establishing a precertification evidentiary hearing before the Board, a challenger under § 1–1313(c) & (d) will remain free to await Board certification of the election and then seek timely review in this court. We shall then refer the matter for an evidentiary hearing either to the Superior Court, as in this case, or to the Board itself, see *Allen*, 663 A.2d at 491, when circumstances warrant.

Conceivably, a precertification hearing granted voluntarily by the Board upon a challenger's request would result in a record adequate for our review despite the Board's lack of subpoena power; and, given the expense of going to court, a challenger may be inclined, all things considered, to prefer trying to resolve the matter before the Board. We encourage such an administrative proceeding for whatever can be accomplished. For example, the challenger might prevail, obviating any need for that challenger to seek further review under § 1–1315(b). Or the challenger might lose, but the record might be sufficient for our § 1–1315(b) review without referral to the Superior Court.

Or, finally, the challenger might lose, and a Superior Court hearing might be necessary for completion of an adequate record for our review; but the Superior Court might be able to adopt the Board's hearing record as part of the court's own hearing as this court's special master under § 1–1315(b).

Hereafter, therefore, a precertification Board hearing on a § 1–1313(c), (d), challenge to a registrant found qualified to vote by the precinct captain can be very useful. But it will be legally optional, not an administrative remedy the challenger must exhaust, since the statute does not require it.[18]

### D.

We turn, finally, to how the trial court shall proceed in this case. At the outset, the court will want to make a generalized review and determination of the number of challenges at issue before the court decides to schedule individual voter hearings. Of the 800 challenges originally contemplated, Barbara Zartman testified at the Byrd hearing that petitioners made only 368 because of alleged crowded conditions and noise. We leave to the trial court the resolution of whether, under the circumstances, any challenge shall be entertained in addition to those actually made at the precincts.

Furthermore, a significant number of the challenges—intervenors claim approximately 100—were made in Byrd's district and are not at issue here. That leaves approximately 268 challenges. Of these, intervenors represent that approximately 220 were in ANC District 2E05, where Fogarty prevailed over Jost by 235 votes according to the Board's certification. If those numbers are correct and the trial court were not to entertain more than the 268 challenges, the challenges to student voters—taking them all away from Fogarty—would not affect the outcome, and thus hearings of individual voter challenges in that district presumably would be unnecessary. ANC District 2E03, of course, where petitioner Scolaro lost to Sinderbrand by three votes, presents a different situation;

18. Because of the absence of an appropriate administrative remedy for a voter registration challenge of the kind at issue here, remedial legislation is urgently needed.

the 48 or so remaining challenges could make a difference.

 As to the trial court's review of individual challenges, we have recognized a presumption that registered voters are "legally qualified" to vote, see Allen, 663 A.2d at 495, particularly because they have signed a voter declaration, subject to stiff criminal penalties, that they satisfy all voter requirements including residency. It follows that anyone who challenges another's voting registration has the burden to prove its invalidity. Cf. id. (noting that party contesting election has "burden to prove its illegality"). As indicated earlier, however, petitioners used a preprinted challenge form: "student has not rebutted presumption of home-state domicile with specific evidence of new domicile in D.C." Intervenors vigorously argue that this is not a valid challenge because there is no such presumption. See Whatley, 482 F.2d at 1234 (holding that "appellants have not demonstrated that treating persons as presumptive nonresidents simply because they are students is necessary to promote any compelling state interest," and thus such a statutory presumption, rebuttable only by evidence student intends to make college community "his [or her] home indefinitely after he [or she] ceases to be a student," violates Equal Protection clause); see also United States v. Texas, 445 F.Supp. at 1255–61 (citing cases).

 We agree with intervenors. Contrary to petitioners' contention, the signed registration form—one we have held valid—creates a presumption that the registrant is a qualified elector. See Allen, 663 A.2d at 495. If petitioners' challenges rested entirely on the preprinted challenge forms, therefore, we would have to conclude that the challenges were inadequate as a matter of law, and we would dismiss the petition without need for further fact-finding.

Petitioners have alleged, however, that they attempted to augment the challenges with additional information, such as "permanent address in Florida" or "student lists a permanent New Jersey address"; that a number of such augmented challenges were proffered; and that petitioners stopped adding such information only because the precinct captain, Spencer, on orders from Board General Counsel McCrory–Miller, made it clear that challenges to student voters would not be honored. Enough proffered evidence supports petitioners' contention that we are obliged to order further fact-finding—provided that, in every challenge, petitioners proffer evidence other than the preprinted form before a voter is called before the court.

At every challenge hearing, therefore, counsel for petitioners, who bear the burden of persuasion, must confront each student voter with evidence that puts the voter's District of Columbia residence on election day in doubt. Petitioners have proffered that the Georgetown University Telephone Directory for 1995–1996, as well as a compilation of freshmen—both listing most students as having permanent addresses elsewhere—should be enough to shift the burden of explanation (commonly called the burden of production) to the voter whose listed address is outside the District. We have not seen this directory or compilation and, absent proper fact-finding, are not in a position to say whether they have the probative value petitioners claim or not. The trial court will have to make that call in the first instance.

The statute itself suggests specific bases for confirming residency: "Business pursuits," "Employment," "Income Sources," "Residence for income or other tax purposes," "Residence of parents, spouse, and children," "Leaseholds," "Situs of personal and real property," and "Motor vehicle registration." D.C.Code § 1–1302(16)(B). The Board's regulations also recognize nonexclusive documentation the fact-finder may take into account in deciding whether a would-be voter in fact is a District resident: a "District of Columbia motor vehicle operator's permit," an "official District of Columbia nondriver's identification card," "any other official identification card or license issued by a District of Columbia or United States government agency," an "identification card issued by an employer in the normal course of business," a "check-cashing card issued by a merchant in the normal course of business," a "real estate tax bill or receipt," a "current utility or other bill," or a "[c]urrent bank statement, printed deposit slip, or check." 3 DCMR § 721.5.

Because the registration form will show the voter's signature verifying (subject to criminal prosecution if known to be "untrue") that the voter "live[s]" at the specified District of Columbia address and "do[es] not claim the right to vote anywhere outside D.C.," and because the instructions on the form state that a registered voter must "be a D.C. resident," we are satisfied that any registrant who signed the form is presumptively a valid, District resident voter. Because of this presumption, although the proffered Georgetown University Telephone Directory, for example, may raise a question of residence sufficient to place a burden of explanation on the voter, that voter—to sustain the burden—does not necessarily have to counter with one of the objective indicia of local residence listed in D.C.Code § 1–1302(16)(B) or in 3 DCMR 721.5. The trial court may well find a registered voter's sworn testimony, verifying the facts in the signed registration form, sufficiently credible to offset any question raised in a challenge based solely on the university directory or otherwise.

■ A student, for example, could testify that he or she had consciously decided to change a prior residence to the District out of a realization that he or she would spend most of each of the next few years here, had become concerned about local issues, and therefore had decided to become a voting resident of the District. A trial court could find such testimony credible—and conclusive.[19]

On the other hand, a registrant's sworn testimony could also be the registrant's undoing. A student might acknowledge, when challenged, that he or she had not intended to renounce a former residence and had registered to vote in the District, without carefully reading the form, because of being importuned to do so based on false representations about the required registration criteria. That response presumably would result in a successful challenge.

We leave further analysis to the trial court, with the help of the parties. We anticipate that upon receipt of the names and addresses of the challenged voters whom the trial court has decided to consider, the court will schedule hearings and send notices as appropriate. The court will have available its subpoena power if necessary. See D.C.Code § 11–942 (1989 Repl.); Super. Ct. Civ. R. 45. Depending on the results of the challenges—including the problem to be faced if not all challenged voters appear, even when subpoenaed—the trial court shall enter findings of fact and conclusions of law, including a recommended remedy, if any is indicated, based on the criteria specified in § 1–1315(b).

Once the trial court has completed the task, its findings and conclusions should be transmitted to this court for further proceedings, which shall include an opportunity for all interested parties to provide supplemental briefing based on the trial court's findings and conclusions. This court will then decide the matter, perhaps after another oral argument. To keep petitioners' timely filing of its § 1–1315(b) petition alive, we shall retain jurisdiction of the case while it is on referral to the Superior Court, much like the situation where we remand the record, but not the case, for further trial court proceedings.

\* \* \* \* \* \*

The petition is referred to the Chief Judge of the Superior Court for assignment to a judge who shall conduct an evidentiary hearing, issue findings of fact and conclusions of law consistent with this opinion, and return those findings and conclusions to this court. In addition, Westy Byrd is dismissed as a petitioner for lack of standing.

*So ordered.*

---

19. The possibility that a student may intend to leave the District after graduation to become a resident elsewhere does not necessarily affect the student's present intent to become a District resident. *See Ramey v. Rockefeller,* 348 F.Supp. 780, 788 (E.D.N.Y.1972) (three judge panel) ("[T]he only constitutionally permissible test is one which focuses on the individual's present intention and does not require him [or her] to pledge allegiance for an indefinite future. The objective is to determine the place which is the center of the individual's life now, the locus of his [or her] primary concern."); *see also Whatley,* 482 F.2d at 1233–34.

GALLAGHER, Senior Judge, concurring and dissenting:

I agree with the expressed concerns of the American Civil Liberties Union (ACLU) which commendably filed an amicus brief in this case and argued at the hearing before this court. The ACLU charges that in the election being contested before the District of Columbia Board of Elections and Ethics "the Board deliberately failed to follow both its governing statute and its own regulations." If so, this is a condition for serious concern in the District of Columbia, the voting process being at the root of the government. To the extent that a number of unqualified voters are permitted to vote for a certain candidate, the votes of that same number of qualified voters for an opposing candidate would be cancelled out and hence those voters would in effect be denied their civil rights in relation to that particular election. *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

In addition to that crucial concern, a review of the voter registration form being used in the District of Columbia reveals a striking defect in relation to the qualification to vote. (See Appendix to this opinion.)

It states that to register to vote one must, *inter alia,* "be a D.C. resident." But at the end of the form is a space the voter registrant must sign under oath, and there it only requires a registrant to swear under potential penalty of five years in jail that "I live in the District of Columbia at the address above," which statement must be signed by the registrant.

Consequently, while the form advises the registrants that they must "be a D.C. resident," this requirement is later defined in the crucial part of the registration form carrying the voter's oath and signature as meaning that one must merely "live in" the District of Columbia in order to qualify as a voter. And it is elementary that in order to qualify to vote in a jurisdiction more than just physical presence is required.

First of all, it is noted that on this voter registration form each of the requirements listed for a voter at the top of the form are literally repeated where the registrant must "swear or affirm" and sign, except that in defining the requirement at the top of the form that one must "be a D.C. resident" the later voter declaration effectively defines this as simply meaning one must be living in the District of Columbia. Although not argued by the ACLU, this is also a grave defect in the registration process and should be corrected.[1]

It is well recognized that "living in" one or more temporary residences is different than having one fixed "residence" for purposes such as voting. As long ago as the beginning of this century, a court in this jurisdiction discussed the issue:

> It is a law of our physical existence that one cannot be in two places at the same time; and it is equally our law of civil existence that there cannot be two places of residence, each with the intention of our remaining there permanently or indefinitely and of its becoming our fixed and permanent home. Of course we know that there can be, and there often are, two places of residence, between which one may divide his time.... But even in that case ... there must, ... for the purposes of the law, be some discrimination.

> \* \* \*

> Authorities are not wanting, if any are required, to show that in statutes relating to taxation, right of suffrage, ... and the like, the term "residence" is used in the sense of "legal residence;" that is, the place of domicile or permanent abode, as distinguished from the place of temporary residence.

*Downs v. Downs,* 23 App. D.C. 381, 387–88 (1904) (citations omitted).

Our current election statute reflects the well-established distinction that "residence" for the purposes of voting requires more

---

**1.** While it may be too late in this proceeding, as a practical matter, to remedy the faulty provisions in the registration form regarding the voter qualification of residence, or deal with the form further, it would appear that it is plainly a funda- mental error in the matter of voter registration that in the public interest should be remedied promptly; and it would be a simple matter to do so on the registration form.

than merely living in the District. D.C.Code § 1–1311(a) (1996 Supp.) commands "No person shall be registered to vote in the District of Columbia unless: (1) He or she meets the qualifications as a qualified elector as defined in § 1–1302(2)," which, in turn, defines a qualified elector, *inter alia,* as one "Who resides or is domiciled in the District...." D.C.Code § 1–1302(2)(A) (1992).

The election statute proceeds to define residence:

> The term "residence," for purposes of voting, means the principal or primary home or place of abode of a person. Principal or primary home or place of abode is that home or place in which the person's habitation is fixed and to which a person, whenever he or she is absent, has the present intention of returning after a departure or absence therefrom, regardless of the duration of the absence.

*Id.* § 1–1302(16)(A) (1992).

The voter registration form at issue in this case is fatally flawed because it is inconsistent with the statute's definition of residence. The form fails to measure the registrant's intent and thus allows people to register if they merely "live in" the District regardless of whether it is their "principal or primary home or place of abode."[2]

The majority opinion rationalizes that if a registrant reads the entire form and reasons correctly on the contradictions in the form reporting the critical "residence" requirement, there is no problem. I should think that, rather, we should urge the Election Board to amend the form so as to get it right on this vital element. It would be a simple thing to accomplish.

Lastly, one may entertain the hope, along with amicus ACLU, that in future elections the Election Board will abide by its own rules and regulations, and thus assure the citizens of the District of Columbia that the votes of qualified voters will be cast without dilution by any unqualified voters.

I join the majority in referring this proceeding to the trial court for an evidentiary hearing, in aid of our judicial review function (D.C.Code § 1–1315 (1996 Supp.)), which can only be accomplished effectively in this proceeding after completion of appropriate fact-finding and conclusions by a trial judge acting in the role of a master for this court.

---

**2.** *Id.* It is naturally assumed, however, that in the remand proceeding the trial judge will be aware that "residence" is required for eligibility to vote.

APPENDIX

# Mail-In Voter Registration Form

★ ★ ★ District of Columbia
Board of Elections and Ethics

**You can use this form to:**
- register to vote in the District of Columbia
- let us know that your name or address has changed
- register with a party or change parties

**To register to vote in D.C., you must:**
- be a U.S. citizen
- be a D.C. resident
- be at least 18 years old on or before the next election
- not be in jail for a felony conviction
- not have been judged "mentally incompetent" by a court of law
- not claim the right to vote anywhere outside D.C.

## Questions? Call 727-2525

*Hearing-impaired people with TDD, call 639-8916*

Información en español: Si le interesa obtener este formulario en español, llame al 727-2525.

0-0078

**Important!**

Keep your voter record up-to-date! If we do not have your current name or address, you might not be on the voter roll. If you are not on the voter roll, you will not be able to vote in the next election.

Use this form to send in your name or address change. If you are not sure if we have your current name or address, use this form, too. Or call 727-2525.

To vote in a primary election, you must be registered with a party that holds a primary election—either the Democratic, Republican or D.C. Statehood Party.

If you register with any other party, or with no party, you may vote only in general or special elections. Use this form if you want to register with a party or change parties (see box 8).

---

Use pen—please print clearly

| | | Clerk | Registration No. |
|---|---|---|---|
| 1. Check one: ☐ new registration ☐ address change ☐ party change ☐ name change | | Reg. Date | **AB 0532788** |

2. Mr. Mrs. Miss Ms. — Last Name — First Name — Middle Name — Suffix (Jr. Sr. II III IV)

3. Address Where You Live — Circle One: NE NW SE SW — Apartment Number — Zip Code

4. Address Where You Get Your Mail (if different from #3) — Zip Code

5. Date of Birth — 6. Daytime Telephone Number(s) — 7. Social Security Number (optional)

**8. Party Registration—check one box**
- ☐ Democratic Party
- ☐ Republican Party
- ☐ D.C. Statehood Party
- ☐ No Party (independent)
- ☐ Other Party (write name below)

**PLEASE NOTE:** To vote in a primary election in the District of Columbia, you must be registered with either the Democratic, Republican or D.C. Statehood Party.

**10. Voter Declaration—read and sign below**
I swear or affirm that:
- I am a U.S. citizen
- I live in the District of Columbia at the address (#3) above
- I will be at least 18 years old on or before the next election
- I am not in jail on a felony conviction
- I have not been judged "mentally incompetent" in a court of law
- I do not claim the right to vote anywhere outside D.C.

9. Name and Address on Last Voter Registration

Name _____

Address _____

(If outside D.C., include county and state)

Signature _____ Date _____

**WARNING:** If you sign this statement even though you know it is untrue, you can be convicted and fined up to $10,000 and/or jailed for up to five years.

Fold on dotted lines, peel off tape, seal and mail