Victor **HERBERT**, Appellant,

v.

**NATIONAL ACADEMY OF SCIENCES.**

No. 91–7099.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 24, 1992.
Decided Sept. 8, 1992.

Michael K. Botts, for appellant.

Calvin H. Cobb, Jr., with whom Maureen O'Keefe Ward and James R. Wright were on the brief, for appellee.

Before EDWARDS, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

In proceedings before the District Court, Dr. Victor Herbert alleged that the National Academy of Sciences infringed upon certain of his copyrighted works while preparing the 10th edition of the Recommended Dietary Allowances. The Academy countered by contending that the District Court lacked subject matter jurisdiction to hear Herbert's claim. Without ruling on the merits of Herbert's case, the District Court found that it was indeed without jurisdiction and, thus, granted the Academy's motion to dismiss. *Herbert v. National Academy of Sciences*, No. 90–361, 1991 WL 387901, 1991 U.S.Dist. LEXIS 7074 (D.D.C. May 22, 1991). We now review that dismissal and, for reasons detailed below, affirm.

## I.

The National Academy of Sciences ("NAS" or the "Academy") is a private, non-governmental,[1] non-profit corporation dedicated to exploring science and its use for the general welfare. It is occasionally called upon by the government to perform certain studies and investigations. One such study, contracted for in 1941, involved the preparation of guidelines regarding the nutrient needs of healthy people. Widely known as the Recommended Dietary Allowances ("RDAs"), these guidelines have been updated periodically by the NAS pursuant to subsequent governmental contracts. It is a 1980 contract for the crafting of a 10th edition to the RDAs that forms the background of this case.

Under the terms of the 1980 contract (the "first contract"), NAS was to provide the National Institutes of Health ("NIH"), a governmental agency, a 10th set of RDAs for which it would be paid $582,815. The Academy subsequently convened a volunteer committee (the "Committee"), including Victor Herbert ("appellant" or "Herbert"), to compile and process the necessary scientific information. In due course the Committee completed a final draft and submitted its work to an internal peer review panel. A dispute apparently arose between the Committee and its reviewers in 1985 regarding the proposed allowances for vitamins A and C. The result: NAS refused to adopt the Committee's work as its own, discharged the Committee, and reported to the government its inability to deliver the 10th RDAs as promised.

At this point, Herbert, apparently an author of various chapters in the 10th edition, copyrighted portions of the Committee draft in his name. Thereafter, he wrote

---

1. Though its charter was granted by Congress in 1863, signed by President Lincoln, and appears at 36 U.S.C. §§ 251–254 (1982), the Academy is not a governmental agency. *See Lombardo v. Handler*, 397 F.Supp. 792, 796 (D.D.C.), *aff'd mem.*, 546 F.2d 1043 (D.C.Cir.1976), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2639, 53 L.Ed.2d 248 (1977).

two letters—one to the former chairman of the Committee and another to the president of the NAS—asserting ownership over these portions of the Committee's draft. Both letters indicate on their face that a copy was sent to officials at NIH.

Meanwhile, the government offered the Academy three options for remedying its breach of the first contract: produce a new 10th edition, presumably by starting afresh with different authors; submit the existing draft with a full explanation of the impasse between the Committee and its reviewers; or, return the $582,815.

In early 1986, NAS indicated that it wished to exercise the second option, sending NIH a summary of steps it had taken to resolve the differences between the Committee and reviewers, along with various drafts that included Herbert's copyrighted materials. In December of the same year, the head of the National Institute of Diabetes and Digestive and Kidney Diseases ("NIDDK"), an arm of NIH, suggested that NIDDK intervene to "play a constructive role" in helping salvage the 10th RDAs, using existing material produced by the Committee. A month later, after a meeting between NIH and NAS, the Academy's executive director memorialized his understanding of the government's position, writing that NIH "made it quite clear ... that they 'own' the draft documents which we have given them ... and that they have ... the clear right to publish material drawn from them." NAS Appendix ("NAS App.") at 79.

By March 1987, NIH completed a review of the Committee's draft and its dispute with the peer review group, concluding that the draft was scientifically sound and should be published. Because the Committee's work had not yet been through a final editing process and was now two years old, however, NIH decided that it needed polishing and a bit of updating. To complete these tasks, NIH again turned to the Academy, entering into a new contract (the "second contract") in 1988 for the "revision and update of a preliminary document prepared by an earlier [NAS] committee" at an additional cost of $162,745. NAS App. at 120.

As the Academy finished this project in 1989, it approached the government contracting officer, Ms. Shirley Shores, for permission to copyright the completed document in the Academy's name; this request specifically stated that the copyright would cover work produced by the Committee under the first contract. Permission was granted and NAS produced a final copy of the 10th RDAs for the government in October 1989, selling approximately 25,000 additional copies to the general public.

Four months later, Herbert filed suit against the Academy, claiming that it had infringed upon his copyright interest in materials he had drafted as a member of the Committee by using them in the final 10th RDAs. Subsequently, the Academy moved to dismiss for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1498(b). In its view, the government had authorized any alleged infringement in connection with the 10th RDAs and, consequently, under § 1498(b), Herbert's exclusive remedy was by action against the United States in Claims Court. Section 1498(b) provides, in pertinent part, that

whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the *authorization or consent of the Government, the exclusive remedy of the owner of such copyright shall be by action against the United States in the Court of Claims....*

28 U.S.C. § 1498(b). (Emphasis added.)

In October 1990, the District Judge held oral argument on the motion to dismiss. Ultimately, he decided against granting a dismissal at that time, though he did direct the Department of Health and Human Services (HHS), NIH's parent agency, to show cause why it, rather than the Academy, was not the proper defendant in this case; he also asked HHS to show why the case ought not be dismissed for lack of subject matter jurisdiction. At a show cause hear-

ing in November 1990, HHS argued that it had not authorized the alleged infringement and, therefore, that § 1498(b) had no application to this case. Indeed, it introduced a sworn declaration from contracting officer Shores indicating that she had never authorized any copyright infringement, nor was even informed of a copyright dispute.

Five months later, HHS switched course. In April 1991 it executed a modification to its second contract with NAS (the "modification"), providing that

> [t]he Government authorizes and consents to the infringement of any copyright in any work protected under the laws of the United States in performing this contract or any subcontract at any tier.

Herbert's Appendix ("Herbert App.") at 16. After HHS's change of heart, NAS quickly filed an amended motion to dismiss for lack of subject matter jurisdiction. It contended that whatever lingering doubts had previously existed about governmental authorization and, thus, the relevance of § 1498(b), were now surely settled. The District Court held another hearing after which it did agree to dismiss the case, holding that

> [t]he evidence shows that the United States authorized the use of [any materials Herbert may have copyrighted].... Accordingly, [Herbert's] exclusive remedy lies in an action against the United States in the United States Court of Claims. Under [§ 1498(b)], this Court lacks subject matter jurisdiction over this action, and the above-captioned case will be dismissed.

*Herbert,* No. 90–361, 1991 WL 387901, at *4, 1991 U.S.Dist.LEXIS 7074, at *10.

Herbert has now lodged this appeal claiming that the District Court erred in granting the dismissal on a variety of grounds. First, *even assuming* that the government did authorize the alleged infringement, Herbert suggests the District Court should have retained jurisdiction. In his view, even when applicable, § 1498(b) does not divest the District Court of jurisdiction; instead, it merely provides the

Academy with an affirmative defense to pursue within District Court.

Alternatively, Herbert argues that the District Court's finding of governmental authorization is simply wrong: in his view of the factual record, NIH never consented to NAS's alleged infringement. Necessarily, then, § 1498(b) by its own terms is inapplicable and a dismissal based upon its provisions would be improper.

In addition to these two substantive attacks on the District Court's decision, Herbert contends a reversal is warranted to remedy violations of his procedural rights: he claims he received inadequate notice of the amended motion to dismiss; he also argues he was not permitted any opportunity to conduct discovery on the modification to the second contract.

We explore each of these arguments in turn.

### II.

A. *The Nature of § 1498(b) and the Prohibition Against Tardy Arguments*

Throughout argument before the District Court and in the initial round of appellate briefs, both parties conceded that, if triggered, § 1498(b) would mandate a dismissal for lack of subject matter jurisdiction. Their disagreement, thus, focused solely on the question of whether in fact § 1498(b) was triggered—*viz.* whether governmental authorization for the use of Herbert's materials was ever given.

■ In his reply brief on appeal, however, appellant contends for the first time that, even if applicable, § 1498(b) does not deny District Court jurisdiction over his claim. It is his new-found faith that § 1498(b) merely provides the Academy with an affirmative defense to press before the trier of fact within District Court. By way of support, appellant's reply brief points us to a terse 1926 Supreme Court decision which states that 28 U.S.C. § 1498(a)—§ 1498(b)'s sibling provision— "goes to the merits of the matter, and not merely to the question of jurisdiction." *Sperry Gyroscope Co. v. Arma Engineering Co.,* 271 U.S. 232, 235, 46 S.Ct. 505,

506, 70 L.Ed. 922 (1926). Appellant also notes in his reply brief that the Federal Circuit has indeed read § 1498(a) as simply codifying an affirmative defense. *Manville Sales Corp. v. Paramount Systems, Inc.,* 917 F.2d 544, 554–55 (Fed.Cir.1990).

This Court, of course, generally refuses to entertain arguments raised for the first time in an appellant's reply brief. *See, e.g., United States v. Caicedo–Llanos,* 960 F.2d 158, 164 (D.C.Cir.1992); *Golden Pacific Bancorp v. Clarke,* 837 F.2d 509, 513 (D.C.Cir.1988); *McBride v. Merrell Dow and Pharmaceuticals, Inc.,* 800 F.2d 1208, 1211 (D.C.Cir.1986); *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 284 n. 32 (D.C.Cir.1981); *United States v. Haldeman,* 559 F.2d 31, 78 n. 113 (D.C.Cir. 1976) (en banc) (per curiam), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *see also* Fed.R.App.P. 28(a)(4). The reasons for our rule on this score are pragmatic and plain. To consider an argument discussed for the first time in reply would be manifestly unfair to the appellee who, under our rules, has no opportunity for a written response. Moreover, it would risk the possibility "of an improvident or ill-advised opinion," given our dependence as an Article III court on the adversarial process for sharpening the issues for decision. *McBride,* 800 F.2d at 1211. After all, "[t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983).

Admittedly, there do exist circumstances in which a court may consider, or even raise *sua sponte,* arguments ignored or left undeveloped by counsel in the first round of briefing. For instance, as courts of limited jurisdiction, we are affirmatively obliged to consider whether the constitutional and statutory authority exist for us to hear each dispute put to us—and we must decline to proceed if they do not. Under our "plain error" doctrine, we may also intercede to decide issues not raised in District Court when a manifest injustice might otherwise result.[2]

Herbert's late-blooming argument, however, does not qualify for these or any other possible exceptions to our general rule. Herbert does not even intimate that we are without jurisdiction to consider his case; indeed, his point is nearly the opposite: in arguing that § 1498(b) is only an affirmative defense—not a jurisdictional barrier—he is, in essence, complaining that the District Court erred by refusing to entertain a claim over which it possessed full jurisdiction. While courts always must decline to decide cases over which they have no power, the converse of that rule does not hold: Article III tribunals are not absolutely bound to render judgment on every argument over which they obtain jurisdiction. Indeed, we have a myriad of prudential doctrines—such as our rule against entertaining new arguments raised in reply briefs—that lead us to demur even when we may have the power to decide.

Moreover, Herbert cannot convincingly claim that it would be plain error to ignore his new argument, if indeed that doctrine pertains in the civil context. The question of whether § 1498(b) is only an affirmative defense is not itself free from doubt.[3] In addition, treatment of that section as jurisdictional does not result in any manifest

---

**2.** Of course, the "plain error" doctrine is at home in the criminal context. *See* Fed. R.Crim.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed [by an appellate court] although they were not brought to the attention of the [trial] court.") The applicability of, and potential standards for, the plain error doctrine in the civil context remain points of some significant debate. *See Hobson v. Wilson,* 737 F.2d 1, 32 n. 96 (D.C.Cir.1984).

**3.** While the Federal Circuit in *Manville* interpreted the Supreme Court's 1926 *Sperry* holding to mean that § 1498(b) only provides an affirmative defense, we note that a pair of post-*Sperry* decisions suggest a different view. In *Alma Motor Co. v. Timken–Detroit Axle Co.,* 329 U.S. 129, 137–39, 67 S.Ct. 231, 234–35, 91 L.Ed. 128 (1946), the Supreme Court characterized a related statutory provision as jurisdictional; this court also stated in *Auerbach v. Sverdrup Corp.,* 829 F.2d 175, 181 (D.C.Cir.1987), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1075, 99 L.Ed.2d 234 (1988), that § 1498(b) "concerns a want of jurisdiction."

injustice: he may, of course, continue to pursue his case in the Court of Claims.

In sum, we find no compelling reason to overcome our general prohibition against entertaining new arguments raised in reply. Indeed, the wisdom of our prohibition is reinforced by the particulars of this case. The Academy was undeniably startled by appellant's new view of § 1498(b) and unable to consider the question in its brief, *see* Transcript of Oral Argument, United States Court of Appeals ("USCA Tr.") at 19; similarly, this court was left without the benefit of the adversarial process to explore and refine the many questions appellant's new view raises.[4] We, thus, leave the nature and effect of § 1498(b) to be decided by another panel on another day. Today we decide this case, as it came to us, on the understanding that § 1498(b), when applicable, strips the District Court of subject matter jurisdiction over authorized copyright infringement.[5]

### B. *Assessing Evidence of Authorization*

Turning now to the central issue before the District Court and in the briefs before us, it is Herbert's contention that the government never authorized infringement upon his copyrighted work in the preparation of the 10th RDAs. Without such authorization, of course, § 1498(b) is inapplicable and a dismissal based on that section would be inappropriate.

Before proceeding to analyze appellant's views on this score any further, we first pause to recall the standard of review appropriate in reviewing a dismissal for lack of subject matter jurisdiction.

### 1. Reviewing the Standard of Review

Under settled law, the District Court may in appropriate cases dispose of a motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) on the complaint standing alone. But where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.1981). *See also Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947); *Hohri v. United States*, 782 F.2d 227, 241 (D.C.Cir.1986), *vacated on other grounds*, 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987); *Wilderness Soc'y v. Griles*, 824 F.2d 4, 16–17 n. 10 (D.C.Cir.1987); 5A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350, at 213 (1990) (collecting citations). The posture in which the motion is presented to trial court has a profound effect on the manner in which this Court will review its disposition.

If the trial court rests on either of the first two bases in deciding the motion to dismiss, necessarily it will not need to decide among conflicting factual positions, taking instead the undisputed facts within or outside the pleadings as true. Consequently, the only matters before us on appeal will be whether the District Court's application of the law is correct and, if the decision is based on undisputed facts, whether those facts are indeed undisputed. This court, of course, will conduct an independent, *de novo* review on all questions of law. *See Hohri*, 782 F.2d at 241. If, however, the trial court rests not only upon undisputed statements, but determines disputed factual issues, we will review its findings as we would any other district court's factual determinations: accepting them unless they are "clearly erroneous." *See Auerbach v. Sverdrup Corp.*, 829 F.2d 175, 178 (D.C.Cir.1987); *Williamson*, 645 F.2d at 413.

We note in passing a few additional points. First, a trial court relying upon its own resolution of disputed facts should provide, as the District Court did here, an explicit explanation of its findings

---

4. Indeed, so startling is the issue that the Academy has sought leave of this Court to file a supplemental brief discussing it.

5. We emphasize that nothing in our decision today should be taken as deciding with finality whether § 1498(b) is a jurisdictional statute or merely the codification of an affirmative defense.

so that judicial review might be had. *See* Fed.R.Civ.P. 52. Second, though the trial court may rule on disputed jurisdictional facts at any time, if they are inextricably intertwined with the merits of the case it should usually defer its jurisdictional decision until the merits are heard. *See Land,* 330 U.S. at 731, 67 S.Ct. at 1009. Finally, should the trial court look beyond the pleadings, it must bear in mind what procedural protections could be required to assure that a full airing of the facts pertinent to a decision on the jurisdictional question may be given to all parties. Indeed, this Court has previously indicated that ruling on a Rule 12(b)(1) motion may be improper before the plaintiff has had a chance to discover the facts necessary to establish jurisdiction. *Collins v. New York Central System,* 327 F.2d 880 (D.C.Cir.1963). In many instances it may be necessary to hold evidentiary hearings in resolving particularly complicated factual disputes rather than to rely on affidavits alone. *See Williamson,* 645 F.2d at 414.[6]

### 2. The Factual Basis of the District Court's Decision

In the instant dispute, the District Court rested its decision regarding jurisdiction upon its determination that the government authorized the Academy's infringement—a hotly contested factual issue. Consequently, then, we may overturn the District Court's ruling only if its finding is clearly erroneous—only if, after reviewing the evidence, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *accord American Hospital Ass'n v. Sullivan,* 938 F.2d 216, 220 (D.C.Cir.1991).

■ Under our caselaw, the District Court was free to find authorization so long as "explicit acts or extrinsic evidence" could be found showing that the "government [intended] to accept liability for a specific act of infringement." *Auerbach,* 829 F.2d at 177. In *Auerbach,* we suggested that this standard might be satisfied in a variety of ways. In addition to the existence of express documentary evidence indicating authorization, we indicated that evidence of implied consent might suffice;[7] so might a demonstration that the government made the infringement necessary by failing to give the contractor discretion to use alternative means that might have avoided infringement.[8] The District Court here relied on evidence properly falling within each of these analytical categories.

To begin, the District Court pointed out that the government received copies of Herbert's two 1985 letters asserting rights to the Committee draft and, thus, was on notice about his potential claim. The District Court also noted that the government later expressly provided the Academy with the option of producing the Committee's

---

**6.** In *In re Swine Flu Immunization Prod. Liability Lit.,* 880 F.2d 1439, 1442–43 (D.C.Cir.1989), this Court stated that, when reviewing a Rule 12(b)(1) dismissal "based in part upon matters outside the pleadings," an appellate court should "look to the standard of Rule 56" and, thus, "assess plaintiff's complaint and her submissions ... by asking whether she showed that a reasonable factfinder could rule in her favor."

We understand this language merely to suggest in a slightly different formula what we have stated above with regard to the "second" scenario in which a trial court may decide a Rule 12(b)(1) motion. That is, if the trial court looks beyond the pleadings to undisputed factual contentions, this Court—like the trial court—will ordinarily accept those contentions as true. *Swine Flu* on its facts dealt only with an undisputed factual record and, thus, we see nothing in it that would preclude the well-established practice—endorsed by the Supreme Court

forty-five years ago in *Land,* 330 U.S. at 735 n. 4, 67 S.Ct. at 1011 n. 4—of allowing the District Court to make findings when a factual dispute regarding jurisdiction does arise. Nor do we see anything indicating that anything other than the clearly erroneous standard of review would be appropriate if and when the District Court does so.

**7.** According to *Auerbach,* evidence probative of implied consent could include a "contracting officer['s] instructions," "specifications or drawings which impliedly sanction and necessitate infringement," or "retroactive consent" given by the government. *Auerbach,* 829 F.2d at 180 (citing *Hughes Aircraft Co. v. United States,* 534 F.2d 889, 901, 209 Ct.Cl. 446 (1976)).

**8.** *Auerbach,* 829 F.2d at 180 (citing *Bereslavsky v. Esso Standard Oil Co.,* 175 F.2d 148, 149 (4th Cir.1949)).

draft as one means of remedying its breach of contract—a demonstration that NIH was willing to use the very material it already knew Herbert had declared to be his own. Minutes of meetings between NAS and NIH officials in January and March of 1987 which state that the government "made it quite clear ... [that it felt it had] the clear right to publish material drawn from them," NAS App. at 79, also led the District Court to the conclusion that NIH knew of Herbert's claim and wished to proceed with the 10th edition based on the Committee draft anyway.

The District Court also found that the second contract supported a finding of authorization: with that document the Academy explicitly offered to produce "a revision and update of a preliminary document prepared by an earlier ... committee," NAS App. at 120; the government of course accepted, as NIDDK had been the first to suggest that the 10th edition be based "in whole or in part on existing material." Herbert App. at 91. As the District Court also noticed, months later the Academy requested and received permission from the government to copyright the entire 10th edition, including portions of the Committee's draft produced under the first contract and subject to Herbert's claims.

Finally, the District Court found that, whatever remaining ambiguity existed on the question of authorization to this point was amply clarified by the modification to the second contract. There the government made crystalline its intentions to authorize infringement on Herbert's work.

Herbert challenges the District Court's findings on a variety of grounds; after careful review, however, we find only the following few points substantial enough to warrant discussion. First, he contends that the NIH's decision to permit NAS to remedy its breach of the first contract by submitting the Committee draft—including his work—was not tantamount to authorization. Since two other options were also given for remedying the breach—neither of which necessitated any infringement—NAS could have avoided any infringement altogether. Second, he proffers two reasons

why the minutes of the January and March 1987 meetings should not be taken as evidence of authorization: they were self-serving documents written by NAS officials; and, read in context, he argues they do not suggest NIH believed it owned the Committee draft.

Third, Herbert recalls the declaration of contracting officer Shores in which she denies authorizing, or even hearing of, a copyright infringement by NAS. Herbert suggests this statement is definitive evidence that authorization was never given nor intended. Finally, he contends that any attempt to rely on the second contract amendment must be rejected: in his view, retroactive authorization is impermissible under § 1498(b); even if it were statutorily permissible, it should still be prohibited in this instance as the Academy failed to supply any consideration for the dramatic modification it received.

None of these objections carry enough firepower to pose a serious challenge to the District Court's findings which come to us "well armed with the buckler and shield" under the clearly erroneous standard of review. *Horton v. U.S. Steel Corp.,* 286 F.2d 710, 713 (5th Cir.1961). Though the government supplied NAS two options for remedying its breach of the first contract that did not require the use of Herbert's materials, it cannot be gainsaid that NIH *also* provided NAS with one option that *did* involve the use of Herbert's claimed materials. This fact, when coupled with NIH's knowledge of Herbert's claims, might itself be sufficient evidence to constitute authorization. In sum, the mere happenstance that NIH provided other options not requiring infringement does not diminish the fact that one option it plainly authorized did require the use of Herbert's alleged work.

Regarding the January and March 1987 minutes, there is no substantiated suggestion that, though taken by NAS officials, they represent anything other than what they purport to be: further evidence that NIH asserted ownership over the Committee's work after having received notice of Herbert's claim. Appellant's contention that the minutes fail to support NIH's as-

sertion of ownership is belied by the minutes themselves.[9]

Turning to the Shores declaration, we do not doubt that it bears on the question of implied consent. However, its relative significance is open to question in the face of substantial documentary evidence evincing the government's knowledge of Herbert's claim and its authorization of the continued use of the Committee draft—even though it contained Herbert's work. Indeed, the Shores statement is at best but one piece of a larger mosaic; as such, the District Court's failure to give it greater effect than other equally convincing evidence hardly rises to the level of clear error.

Finally, we note that in *Auerbach* we intimated that the government may retroactively authorize infringements under § 1498(b). *See supra* n. 7. That said, we see no reason to explore the use of retroactive authorization in this case: whatever effect the modification to the second contract might have had was only cumulative. The extant evidence of prospective authorization, while not unrebutted, is more than enough to satisfy our standards on review.

In sum, the evidence on which the District Court relied is sound, and its conclusion free from plain error: authorization was given and § 1498(b) thus triggered. Given our refusal to entertain appellant's argument that § 1498(b) is a mere affirmative defense in this case, the District Court did not err in dismissing Herbert's claim for want of subject matter jurisdiction.

### III.

Appellant does not end his attack on the District Court's dismissal with his allegations of substantive legal error. Instead, he continues on, arguing that the manner in which his claim was handled trenched upon his rights in two respects, both of which warrant reversal. First, he claims that he received inadequate notice of the District Court's intention to hear the amended motion to dismiss. Second, he

maintains that the District Court improperly refused to allow him an opportunity to conduct any discovery on the modification to the second contract.[10]

■ Neither of these arguments can carry the day. Even if an error was made regarding the notice afforded Herbert, there is not an iota of evidence to intimate that he was prejudiced in any way by it: Herbert suggests no argument or issue he would have raised if more notice had been provided. Moreover, appellant's counsel conceded in oral argument that the District Court accepted his supplemental filings after the hearing, USCA Tr. at 10, thereby providing him an ample opportunity to be heard. Without any prejudice to point to, appellant's notice claim must fall flat: our obligation to correct procedural errors in District Court does not extend to abstract or purely academic missteps. *See* 28 U.S.C. § 2111 ("the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties"). *See also* Fed.R.Civ.P. 61 ("the court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

■ What holds for appellant's notice argument applies to his discovery claim. The sole matter on which Herbert apparently wished to conduct additional discovery involved the modification to the second contract and, thus, bore only on the legal question of retroactive consent. Reply Brief of Appellant at 4. As we have already discussed, the second contract modification is superfluous to a finding of authorization: the District Court's judgment can be sustained with reference to evidence of prospective authorization alone. Consequently, even assuming the District Court erred in refusing additional discovery on this issue, its error was again harmless.

---

**9.** The minutes succinctly state that "[the government] would assume responsibility for dealing with the former committee [which included Herbert]." NAS App. at 83.

**10.** There is no dispute that appellant received an adequate opportunity to conduct discovery on every other issue in this case.

At this juncture, we wish to note our deep doubts about the existence of any error at all with regard to the discovery request. Appellant represented throughout his briefs and in oral argument to this Court that he "clearly requested discovery" on the contract modification. Reply Brief of Appellant at 4. *See also.* Initial Brief of Appellant at 39–40; USCA Tr. at 33–34. However, the record reveals that he in fact made *no* attempt—let alone anything approaching a "clear" one—to seek additional discovery.[11] That the District Court might not offer appellant discovery without some remotely intelligible request is not, we think, plainly erroneous in these circumstances.

### CONCLUSION

We refuse to entertain appellant's late-coming argument that § 1498(b) is only the codification of an affirmative defense. Treating § 1498(b) as jurisdictional, then, we conclude that the District Court did not clearly err in finding that the government authorized the Academy's alleged infringement. Moreover, we ascertain no procedural error affecting appellant's substantive rights. The judgment of the District Court dismissing Herbert's case for lack of subject matter jurisdiction, therefore is

*Affirmed.*

---

11. By way of example, appellant has represented to this Court that his request for discovery came out "clearly" in the following colloquy with the District Court:

THE COURT: [Have you] got standing to raise the fact that two parties entered into a contract and whether there was valid consideration between those two parties?

MR. BOTTS: I think before this Court dismisses this action it has the obligation to look into the contract and see if the amendment is legally valid, yes.

Herbert App. at 73.