**Patricia SCOLARO, et al., Plaintiffs,**

v.

**DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS, et al., Defendants.**

**No. CIV. A. 96–02643 (HHK).**

United States District Court, District of Columbia.

June 14, 2000.

See also 691 A.2d 77.

Don W. Crockett, Washington, D.C., for Plaintiffs.

Jacques P. Lerner, Assistant Corporation Counsel, D.C., Office of the Corporation Counsel, Special Litigation Division, Washington, D.C., for Defendants.

Daniel H. Bromberg, Jones, Day, Reavis & Pogue, Washington, D.C., for Intervenors.

## MEMORANDUM OPINION

KENNEDY, District Judge.

This case arises from events surrounding the 1996 election of Advisory Neighborhood Commissioners ("ANC Commissioners") in Georgetown, a neighborhood in the District of Columbia. Presently before the court are the following motions: defendants District of Columbia's ("District") and District of Columbia Board of Elections and Ethics' ("Board") combined motion to dismiss; intervenors' motion to dismiss; plaintiffs' motion for summary judgment; and plaintiff Westy Byrd's motion to reconsider this court's November 27, 1996 Order (the "Order") dismissing with prejudice her claim for injunctive and declaratory relief. Upon consideration of the motions and the oppositions thereto, the court concludes that defendants' motion to dismiss should be granted; intervenors' motion to dismiss should be granted; plaintiffs' motion for summary judgment should be denied as moot; plaintiff Byrd's motion to reconsider should be denied; and this case should be dismissed.

## I. BACKGROUND

Plaintiffs Patricia Scolaro, Beverly Jost, and Westy Byrd are registered voters of the District who ran for ANC positions in the November 5, 1996 general election.[1] During the summer preceding the election, at the urging of plaintiff ANC Commissioners and others, the District ceased its long-standing practice of exempting from its motor vehicle registration requirement students attending Georgetown University ("GU") and George Washington University ("GWU"). Early that fall, the students responded by organizing voter-registration drives to increase the number of students registered to vote in the District. Two GU students, intervenors James Fogarty and Rebecca Sinderbrand, registered to vote in the District and qualified as candidates for two ANC positions.

In response to the voter-registration drive, plaintiff Byrd circulated to students a flyer that stated as follows:

If you register to vote in D.C., you will become a legal resident of D.C. As a [r]esident of D.C.,

1. you must pay D.C. income tax[;]

2. you may lose any grant money from your home state[;]

3. you must obtain a D.C. driver's license[;]

4. you must register your car in D.C. Any Zone 2 sticker you have would be revoked.

Am. Compl. ¶¶ 23–24. After plaintiffs determined that GU students living in the three single-member ANC districts in west Georgetown had submitted more than 800 new voter-registration applications, plaintiff Byrd wrote to the Board, seeking an immediate investigation. Board Chairman Wilson responded by stating that the Board would schedule a hearing to determine whether Byrd's circulation of the

---

1. For purposes of defendants' and intervenors' motions to dismiss, the factual allegations in the First Amended Complaint, which form the basis of this overview, are taken as true and construed in the light most favorable to the plaintiff. *See, e.g., Croixland Properties Ltd. Partnership v. Corcoran*, 174 F.3d 213, 215 (D.C.Cir.1999) (regarding motion to dismiss brought under Fed.R.Civ.P. 12(b)(6)); *Hohri v. United States*, 782 F.2d 227, 241 (D.C.Cir.1986), *vacated on other grounds*, 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987) (regarding motion to dismiss brought under Fed.R.Civ.P. 12(b)(1)). Of course, this court does not rely upon plaintiffs' characterizations of prior legal decisions in this case, but rather upon the written opinions issued by this court and the District's local courts.

flyer and writing of the letter constituted voter intimidation.

The elections took place on November 5, 1996. Plaintiffs' poll-watchers issued numerous challenges to student voters, the details of which are chronicled in two lengthy opinions issued by the District of Columbia Court of Appeals ("DCCA") and need not be recounted here. *See Scolaro v. District of Columbia Bd. of Elections and Ethics,* 717 A.2d 891 (D.C.1998) ("*Scolaro II*"); *Scolaro v. District of Columbia Bd. of Elections and Ethics,* 691 A.2d 77 (D.C.1997) ("*Scolaro I*"). After all of the ballots were counted, the Board determined that intervenor Sinderbrand had defeated plaintiff Scolaro by five votes; that intervenor Fogarty had defeated plaintiff Jost by 235 votes; and that plaintiff Byrd had won her district.

Plaintiffs filed this federal-court suit on November 22, 1996. Three days later, plaintiffs filed in the DCCA a Petition for Review of the November 5th election. In an order issued November 27th, this court, per Judge Oberdorfer, ordered that plaintiffs' vote-dilution and due process claims be stayed pending the resolution of proceedings in the District's local courts and that plaintiff Byrd's claim for declaratory and injunctive relief relating to the threatened Board hearing be dismissed with prejudice. *See Scolaro v. District of Columbia Bd. of Elections and Ethics,* 946 F.Supp. 80 (D.D.C.1996).

In January 1997, the Board convened a hearing regarding plaintiff Byrd's pre-election activities, including her circulation of the flyer. After hearing testimony for two days, the Board decided to refer the matter to the United States Attorney of the District for possible criminal prosecution. The United States Attorney declined to prosecute.

Meanwhile, in their suit in the District's local courts, plaintiffs pressed the following principal contentions:

1. The Board's voter registration form is invalid under the election statute, D.C.Code § 1–1311(a)(2) (1996 Supp.), and the Constitution.

2. In allowing hundreds of local college students to register to vote, the Board failed to perform its statutory duty under § 1–1302(16) and § 1–1311(a) of the election statute to screen out, on its own initiative, unqualified electors-a failure that resulted in the unconstitutional dilution of petitioners' votes.

3. By allowing virtually all student registrants to vote in spite of petitioners' efforts to challenge their voter qualifications, the Board denied petitioners their constitutional right to due process.

*Scolaro I,* 691 A.2d at 83. The DCCA rejected the first two contentions and referred the third to the Superior Court, acting as special master, for fact-finding.[2] *See id.* After reviewing the special master's report, supplemental briefs, and oral argument, the DCCA denied plaintiffs' petition to set aside the results of the 1996 election. *See Scolaro II,* 717 A.2d at 892. On January 21, 1999, the DCCA issued an order denying plaintiffs' petition for a rehearing en banc. *See Scolaro v. District of Columbia Bd. of Elections and Ethics,* No. 96–1738 (D.C. Jan. 21, 1999).

Plaintiffs then returned to this federal district court, filing on May 27, 1999, their First Amended Complaint ("Amended Complaint"). In their Amended Complaint, plaintiffs raise six claims for relief. Plaintiffs' first claim for relief is based on the theory that the DCCA's construction of the District's election statute deprives them of their Fifth Amendment right to due process of law. Plaintiffs' second claim for relief is based on the theory that the Board's special ballot procedures deprive them of their rights to due process of law and to undiluted votes. Plaintiffs'

---

2. The DCCA also dismissed plaintiff Byrd for lack of standing. *See Scolaro I,* 691 A.2d at 93.

third claim for relief is based on the theory that "the Board's application of the irrebuttable presumption of residence to plaintiffs' attempts to challenge unqualified voters—as subsequently approved by the [DCCA]—" violates their right to undiluted votes.[3] Plaintiffs' fourth claim for relief is based on the theory that the District's local mail-in voter registration form and "motor-voter" registration form do not comply with the requirements for federal elections imposed by the National Voter Registration Act of 1993, 42 U.S.C. §§ 1973gg *et seq.* Plaintiffs' fifth claim for relief is based on the theory that the Board's alleged practice of destroying administrative affidavits regarding special ballots after those ballots have been counted violates 42 U.S.C. §§ 1974 and 1974a. Plaintiffs' sixth claim for relief consists of plaintiff Byrd's action for a declaration that she did not engage in voter intimidation; this claim is also the subject of Byrd's motion for reconsideration of Judge Oberdorfer's order dismissing this claim with prejudice.

Presently before the court are intervenors' and defendants' motions to dismiss the Amended Complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief may be granted; plaintiffs' motion for summary judgment; and plaintiff Byrd's motion for reconsideration of Judge Oberdorfer's order dismissing with prejudice her claim for declaratory relief.

## II. LEGAL STANDARDS

### A. Dismissal

■ In ruling upon a motion to dismiss brought under Rule 12(b)(1), a court must construe the allegations in the complaint in the light most favorable to the plaintiff. *See, e.g., Hohri v. United States,* 782 F.2d 227, 241 (D.C.Cir.1986), *vacated on other grounds,* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). Additionally, a court may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case. *See, e.g., Herbert v. National Academy of Sciences,* 974 F.2d 192, 197 (D.C.Cir.1992); *Haase v. Sessions,* 835 F.2d 902, 906 (D.C.Cir.1987); *Hohri,* 782 F.2d at 241; *Transamerica Leasing, Inc. v. La Republica de Venezuela,* 21 F.Supp.2d 47, 55 (D.D.C.1998); *Bayvue Apts. Joint Venture v. Ocwen Fed. Bank,* 971 F.Supp. 129, 132 n. 5 (D.D.C. 1997).

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, a court must accept the allegations in the complaint as true. *See, e.g., Croixland Properties Ltd. Partnership v. Corcoran,* 174 F.3d 213, 215 (D.C.Cir.1999). All reasonable inferences must be drawn in favor of the plaintiff, and a court should only dismiss a complaint for failure to state a claim " 'if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Id.* (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *see also Price v. Crestar Secs. Corp.,* 44 F.Supp.2d 351, 353 (D.D.C.1999). A court "does not test whether the plaintiff will prevail on the merits, but instead whether the claimant has properly stated a claim." *Price,* 44 F.Supp.2d at 353.

### B. Summary Judgment

Under Rule 56, a motion for summary judgment should be granted only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party's "initial responsibility" consists of "informing the [trial] court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a gen-

---

**3.** Am. Compl. ¶ 76.

uine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted).

If the moving party meets its burden, the burden then shifts to the non-moving party to establish that a genuine issue as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To meet its burden, the non-moving party must show that " 'the evidence is such that a reasonable jury could return a verdict' " in its favor. *Laningham v. United States Navy,* 813 F.2d 1236, 1241 (D.C.Cir.1987) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Such evidence must consist of more than mere unsupported allegations or denials and must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 322 n. 3, 106 S.Ct. 2548. If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

### III. ANALYSIS

#### A. Plaintiff Byrd's Motion for Reconsideration

■ Plaintiff Byrd seeks to have this court reconsider its November 27, 1996 Order dismissing with prejudice her First Amendment claims for declaratory and injunctive relief. Specifically, plaintiff moves this court to amend its Order to dismiss without prejudice her claim for declaratory relief so that she might refile that claim. In support of her motion for reconsideration, Byrd argues that although the Memorandum accompanying the Order explains why injunctive relief was not granted, it does not "indicate[ ] any awareness of plaintiff Byrd's request for declaratory relief, or state[ ] any reason why that claim should also be dismissed." Pl.'s Mot. at 2. Upon careful review, the court has concluded that the analysis in the Memo-

randum fully supports the dismissal of plaintiff's claim for declaratory relief as well as her claim for injunctive relief. Furthermore, the court thinks it unwise to allow the resurrection of a claim, dead three years, that appears to be lifeless still. Accordingly, the court denies plaintiff Byrd's motion for reconsideration.

It is clear from the Memorandum that Byrd's claim for injunctive relief was denied based upon the principles that the United States Supreme Court set forth in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Quoting that decision, this court explained that " 'courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.' " *Scolaro,* 946 F.Supp. at 83 (quoting *Younger,* 401 U.S. at 43–44, 91 S.Ct. 746). This court further explained that " '[c]ertain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not, by themselves[,] be considered 'irreparable' in the special legal sense of that term.' " *Id.* (quoting *Younger,* 401 U.S. at 46, 91 S.Ct. 746). Applying the analysis set forth in *Younger* to the present case, this court concluded that "[t]he principle that discourages federal interference with state prosecutions applies analogously to a pre-prosecution hearing such as the one scheduled by the D.C. Board here." *Id.*

Under *Younger* and its companion case, *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), the same circumstances that warrant denial of injunctive relief generally warrant denial of declaratory relief. In *Samuels,* the Supreme Court held that

> in cases where the state criminal prosecution was begun prior to the federal suit, the same equitable principles relevant to the propriety of an injunction must be taken into consideration by fed-

eral district courts in determining whether to issue a declaratory judgment, and ... where an injunction would be impermissible under these principles, declaratory relief should ordinarily be denied as well.

401 U.S. at 73, 91 S.Ct. 764. Based on the reasoning announced in *Samuels,* the Supreme Court held in *Younger* that declaratory relief, like injunctive relief, is "improper when a prosecution involving the challenged statute is pending in state court at the time the federal suit is initiated." *Younger,* 401 U.S. at 41 n. 2, 91 S.Ct. 746. Having decided that "[t]he principle that discourage[d] federal interference with state prosecutions applie[d] analogously" to the Board hearing, and having determined that injunctive relief was inappropriate under the circumstances, this court appropriately dismissed Byrd's claim for declaratory relief as well.[4]

Having determined that the same principles that supported this court's denial of injunctive relief also supported its denial of declaratory relief, this court finds Byrd's main argument for reconsideration unconvincing. Furthermore, the events giving rise to this controversy, if it can still be called that, are, like the court's decision, more than three years old. The court sees no reason to open the tomb of judgment in this case. Accordingly, plaintiff's motion for reconsideration is denied, and plaintiffs' sixth claim for relief is dismissed.

**B. Intervenors' and Defendants' Motions to Dismiss**

**1. Plaintiffs' First and Third Claims for Relief**

Intervenors and defendants argue that plaintiffs' first and third claims for relief should be dismissed because the *Rooker–Feldman* doctrine deprives this court of jurisdiction to entertain them. The court agrees.

The *Rooker–Feldman* doctrine is derived from two Supreme Court cases: *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1970), and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). In the latter case, which applied the doctrine to the District of Columbia courts, the Supreme Court stated succinctly that "the United States District Court [for the District of Columbia] is without authority to review final determinations of the District of Columbia Court of Appeals in judicial proceedings." *Feldman,* 460 U.S. at 476, 103 S.Ct. 1303. In this case, plaintiffs seek review of final, judicial determinations of the DCCA. Applying the *Rooker–Feldman* doctrine, the court finds that it lacks authority to provide such a review.

The crux of plaintiffs' first claim for relief is as follows:

> The subsequent affirmance of the Board's actions by the D.C. Court of Appeals and that Court's unique and clearly defective construction of the D.C. election statute now permits [sic] non[-]residents to register without swearing they are qualified, relieves [sic] the Board of its statutory mandate to insure that only those qualified to vote are registered and then maintained on the voter registration lists, and erects [sic] a virtually irrebuttable presumption that all registrants are residents. *This stilted construction of the D.C. election statute by* the Board and *the Court of Appeals* has in the past, and will continue in the future, to deprive plaintiffs and all voters of the District of Columbia of their fundamental right under the Fifth Amendment of the Constitution to Due Process of law.

Am. Compl. ¶ 70 (emphasis added). Clearly, plaintiffs seek this court's review of the

---

4. Of course, had no state proceeding been pending, "the propriety of granting federal declaratory relief [could] properly [have been] considered independently of a request for injunctive relief." *Steffel v. Thompson,* 415 U.S. 452, 462, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

judicial determinations that the DCCA made in applying District law to their case. The *Rooker–Feldman* doctrine bars this court from conducting such a review.

Similarly, the crux of plaintiffs' third claim for relief is as follows:

> As a result of the Board's application of the irrebuttable presumption of residence to plaintiffs' attempts to challenge unqualified voters—*as subsequently approved by the D.C. Court of Appeals*—large numbers of students who, under prevailing common law and the D.C. election statute, are actually domiciled in other states, were unlawfully permitted to run for public office, [and] to vote in the general election in the District of Columbia on November 5, 1996 .... Non[-]resident candidates were also unlawfully permitted to run and be elected by non[-]resident voters in the 1998 general election and will continue to do so in violation of the First and Fifth [A]mendments [to] the Constitution until the statute, *as construed by the final decision of the D.C. Court of Appeals* [,] is itself declared unconstitutional.

Am. Compl. ¶ 76 (emphasis added). Again, plaintiffs are seeking review of a final judicial determination of the DCCA. The *Rooker–Feldman* doctrine explicitly bars this court from conducting such a review.

If that were the beginning and the end of the analysis, this case would, as intervenors claim, present an occasion for "a textbook application of the *Rooker–Feldman* doctrine." Intervenors' Memo. at 12. It does not. The implicit assumption embedded in the foregoing analysis—that this case is not exempt from the operation of the *Rooker–Feldman* doctrine—has been the subject of a concerted attack by the plaintiffs. Plaintiffs argue that the *Rooker–Feldman* doctrine does not apply to this case because, when this case was first brought in 1996, this court, applying the *Pullman* abstention doctrine,[5] declined to rule on the constitutional issues then-presented pending the DCCA's resolution of disputed issues of District law. On its face, this argument appears to have substantial merit; as applied to the circumstances of this case, however, it is unavailing.

Plaintiffs rely almost exclusively upon the Supreme Court's opinion in *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). In that case, the plaintiffs, graduates of chiropractic schools who sought to practice in Louisiana without complying with the Louisiana State Medical Practice Act, filed suit in federal district court seeking injunctive and declaratory relief on the basis that the Act, as applied to them, violated the Fourteenth Amendment. *See id.* at 412–13, 84 S.Ct. 461. The district court abstained from hearing the case, theorizing that the state courts might resolve the case by determining that the Act did not apply to chiropractors, thus making it unnecessary for the district court to reach the constitutional issue. *See id.* at 413, 84 S.Ct. 461. The plaintiffs then presented all of their claims, including their Fourteenth Amendment claim, to the Louisiana state courts. *See id.* The state courts ruled against the plaintiffs, holding that the Act applied to the plaintiffs, and that, as applied to the plaintiffs, it did not violate the Fourteenth Amendment. *See id.* at 414, 84 S.Ct. 461. The plaintiffs then returned to the federal district court, which dismissed their claims on the theory that the state courts had

---

**5.** Plaintiffs incorrectly state that this court invoked the *Younger* abstention doctrine in determining to stay its hand with respect to their vote-dilution and due process claims. *See* Pls.' Memo. at 16. In fact, this court invoked the *Pullman* abstention doctrine with respect to those claims, and the *Younger* abstention doctrine with respect to plaintiff Byrd's First Amendment claims. *See Scolaro v. District of Columbia Bd. of Elections and Ethics*, 946 F.Supp. 80 (D.D.C.1996). This distinction is significant because, in general, *Pullman* abstention results in a stay of the federal-court proceedings, but *Younger* abstention results in dismissal.

already ruled on them and that it had no authority to review the state-court proceedings. *See id.* The plaintiffs appealed directly to the Supreme Court, which reversed the dismissal and remanded the case to the district court for a judicial determination of the merits of the plaintiffs' Fourteenth Amendment claim. *See id.* The Supreme Court explained its decision as follows:

> There are fundamental objections to any conclusion that a litigant who has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, *without his consent and through no fault of his own,* to accept instead a state court's determination of those claims.... [Nothing] in the abstention doctrine require[s] or support[s] such a result.

*Id.* at 415, 84 S.Ct. 461 (emphasis added). Quoting *NAACP v. Button,* 371 U.S. 415, 427, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), the Court stated that " 'a party has the right to return to the District Court, after obtaining the authoritative state court construction for which the court abstained, for a final determination of his claim.' " *Id.* at 417, 83 S.Ct. 328. The Court then identified an exception to that rule, stating "[w]e also made clear in *Button,* however, that a party may elect to forgo that right." *Id.* Concluding that portion of its analysis, the Court stated as follows:

> We now explicitly hold that *if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then*—whether or not he seeks direct review of the state decision in this Court—*he has elected to forgo his right to return to the District Court.*

*Id.* at 419, 83 S.Ct. 328 (emphasis added).

The Court then determined that the *England* plaintiffs were entitled to a federal-court hearing because they had submitted their federal claims to the state courts only upon the mistaken, but reasonable, belief that the Court's decision in *Government & Civic Employees Organizing Committee, C.I.O. v. Windsor,* 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957), required them to do so. *England,* 375 U.S. at 420, 84 S.Ct. 461. Properly read, the *England* Court explained, *Windsor* simply required the plaintiffs to make the state courts aware of their federal claims, so that the state statute at issue could "be construed 'in light of' those claims." *Id.* (citation omitted). Recognizing the practical difficulty that a party would face in making a state court aware of its federal claims without litigating them, the Court stated that "a party may readily forestall any conclusion that he has elected not to return to the District Court" by "inform[ing] the state courts that he is exposing his federal claims there only for the purpose of complying with *Windsor,* and that he intends, should the state courts hold against him on the question of state law, to return to the District Court for disposition of his federal contentions." *Id.* at 421, 84 S.Ct. 461. The Court then acknowledged that "[s]uch an explicit reservation is not indispensable; the litigant is in no event to be denied his right to return to the District Court unless it clearly appears that he voluntarily did more than *Windsor* required and fully litigated his federal claims in the state courts." *Id.*

■ In this case, it clearly appears from the record and the two opinions issued by the DCCA that plaintiffs voluntarily litigated their federal claims in the local courts.[6] In their initial Petition for Re-

---

**6.** The *Rooker–Feldman* doctrine is jurisdictional. *See Stanton v. DCCA,* 127 F.3d 72, 75 (D.C.Cir.1997). As stated above, this court may consider such materials outside the pleadings as it deems appropriate to resolve the question of whether it has jurisdiction to

hear the case. *See, e.g., Herbert,* 974 F.2d at 197; *Haase,* 835 F.2d at 906; *Hohri,* 782 F.2d at 241; *Transamerica Leasing, Inc.,* 21 F.Supp.2d at 55; *Bayvue Apts. Joint Venture,* 971 F.Supp. at 132 n. 5. In this case, to resolve this jurisdictional issue, the court has

view, plaintiffs, termed "petitioners" in the local court, state as follows:

> Petitioners further submit that respondent has: (1) Deprived them of their civil rights under the United States Constitution to a fairly-run election with undiluted votes in Precinct Six; [and] (2) deprived them of their rights to substantive Due Process by arbitrarily imposing an irrebuttable presumption on the Precinct Captain that all of petitioners' polling place challenges to unqualified GU student voters were without merit and were to be categorically denied . . . .

Petition for Review at 3, *Scolaro I,* 691 A.2d 77 (D.C.1997) (No. 96–1738) ("Petition for Review"). Thus, from the very beginning of the case, plaintiffs put their constitutional claims before the local courts without any indication that decision of such claims was to be reserved to the federal courts. Plaintiffs then "press[ed]" their unconstitutional dilution and due process arguments before the local courts. *Scolaro I,* 691 A.2d at 83.

That plaintiffs not only made the local courts aware of their constitutional arguments, but also submitted them for decision, is made clear by the characterization of the local proceedings contained in their Petition for Rehearing En Banc. Petition for Rehearing En Banc at 5, *Scolaro II,* 717 A.2d 891 (D.C.1998) (No. 96–1738) ("Petition for Rehearing"). In their Petition for Rehearing, plaintiffs state as follows:

> Because this is one of those rare cases involving several fundamental constitutional questions of exceptional importance to all residents of the District of Columbia, it should be reviewed and decided by the entire Court, sitting en banc, rather than by a two judge division majority. As Judge Gallagher stated in his dissent to the latest majority opinion . . . : 'Here, the fundamental question for resolution was whether the right of [sic] vote of petitioners was diluted illegally, thus resulting in a de-

reviewed the two DCCA opinions and several

privation of the right to vote by many voters.'

Petition for Rehearing at 5.

Nor is this a case in which the local court failed to recognize and resolve the constitutional claims presented. The majority opinion makes clear that the court recognized that constitutional rights weighed on both sides of the scale:

> Petitioners seek to safeguard their constitutional right to vote against dilution by ineligible votes. . . . Intervenors and respondent, however, claim that the challenged student voters' right to vote is equally at stake and that they fulfilled the statutory requirements for eligibility as electors as evidenced by their duly completed and sworn voter registration forms.

*Scolaro II,* 717 A.2d at 893. The majority recognized, as did the dissent, "that 'underlying all aspects of this petition, a delicate balancing of rights is required.'" *Id.* at 897 (quoting Gallagher, J., dissenting). The majority continued: "[a]s we have already decided, however, that balance is tilted, in the first instance, in favor of the registered voter because, as Judge Gallagher recognizes, 'every voter has a right to cast an unquestioned and unintimidated ballot[,][and][t]here should be a real barrier for a challenger to cross before voters can be brought to court to defend the exercise of their franchise.'" *Id.* (quoting Gallagher, J., dissenting). Thus, it is clear that the DCCA recognized the constitutional issues that plaintiffs had put before it, and resolved them against plaintiffs.

The court finds that plaintiffs "freely and without reservation submit[ted] [their] federal claims for decision by the state courts, litigate[d] them there, and ha[d] them decided there," and thus have "elected to forgo [their] right to return to the District Court." *England,* 375 U.S. at 419, 84 S.Ct. 461. Thus, the *England* decision does not spare plaintiffs from the application of the *Rooker–Feldman* doctrine, and

of plaintiffs' filings before that court.

plaintiffs' first and third claims for relief are barred from review.

## 2. Plaintiffs' Second Claim for Relief

Plaintiffs' second claim for relief is based on the theory that by preventing poll-watchers from challenging, or attempting to challenge, voters who vote by special ballot, the Board violated, and will continue to violate, plaintiffs' and other candidates' rights to due process of law and to undiluted votes.[7]

Defendants have moved to dismiss plaintiffs' second claim for relief on the ground that it is inextricably intertwined with the decisions of the DCCA and thus is barred by the *Rooker–Feldman* doctrine. Intervenors have moved to dismiss plaintiffs' second claim for relief on the ground that plaintiffs lack standing. Based on its review of the DCCA's opinions in *Scolaro I* and *Scolaro II*, the court agrees with defendants and intervenors.

As the DCCA's opinions in *Scolaro I* and *Scolaro II* demonstrate, plaintiffs were afforded an ample opportunity in the local courts to challenge the Board's procedures with respect to special ballots. In *Scolaro I*, the DCCA ordered an evidentiary hearing to determine whether plaintiffs' polling-place challenges had been wrongfully denied or disregarded. *See Scolaro I*, 691 A.2d at 86–93. After reviewing the Special Master's Report, the DCCA entertained plaintiffs' argument that the Report "failed to address their complaint that the Board 'unlawfully precluded [Scolaro's] poll watchers from challenging fourteen students who voted by special ballot.'" *Scolaro II*, 717 A.2d at 897 (citation omitted). After considering that argument at great length, the DCCA determined that even if the Special Master had erred, that error was harmless: no questionable special ballots had affected the outcome of the election. *See id.* at 897–99.

■ Plaintiffs now seek to challenge once again the Board's procedures regarding challenges to voters who cast special ballots. In light of the DCCA's opinion, which, under *Rooker–Feldman*, this court does not have the authority to review, plaintiffs cannot establish that they have standing to lodge such a challenge. To establish standing under Article III, plaintiffs must demonstrate that (1) they have "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Svcs., Inc.*, —— U.S. ——, ——, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 431 (D.C.Cir.1998) (en banc), *cert. denied sub nom. National Ass'n for Biomedical Research v. Animal Legal Defense Fund*, 526 U.S. 1064, 119 S.Ct. 1454, 143 L.Ed.2d 541 (1999).

■ Plaintiffs' allegation that they have suffered an injury as a result of the Board's procedures with respect to special-ballot challenges flies in the face of the DCCA's explicit rulings. In other words, to establish standing in this case, plaintiffs would have to prove the local court wrong. An issue essential to plaintiffs' federal case—standing—is inextricably intertwined with the local court's determination that plaintiffs suffered no harm from the Board's procedures governing challenges to voters casting special ballots. Further, plaintiffs' conclusory assertion that the Board's procedures will cause future injury does not satisfy the requirement that the injury alleged be "actual or imminent, not conjectural or hypothetical." *Friends of*

---

**7.** Plaintiffs also advance the theory that the Board's practices violate D.C.Code § 1313(c). As this court explained in its earlier Memorandum, this court lacks jurisdiction to consider plaintiffs' claims that the Board violated the D.C.Code. *See Scolaro*, 946 F.Supp. at 82.

*the Earth, Inc.,* —— U.S. at ——, 120 S.Ct. at 704. Thus, this court is barred by the *Rooker–Feldman* doctrine and by the standing requirement from reviewing plaintiffs' second claim for relief.

### 3. Plaintiffs' Fourth Claim for Relief

█ Plaintiffs' fourth claim for relief is based on the theory that the District's voter registration forms do not comply with the requirements of the National Voter Registration Act of 1993, 42 U.S.C. §§ 1973gg *et seq.* (the "Motor–Voter Act"). Plaintiffs seek declaratory and injunctive relief.

Intervenors argue that this claim must be dismissed because plaintiffs lack standing. Specifically, intervenors point out that plaintiffs neither alleged any injury resulting from the forms' alleged non-compliance with the Motor–Voter Act, nor demonstrated that the declaratory and injunctive relief sought would redress any injury that they might have suffered. In Plaintiffs' Combined Memorandum in Opposition to Defendants' Motion to Dismiss and in Support of Plaintiffs' Cross Motion for Summary Judgment, plaintiffs argue that they "have, in fact, alleged specific injuries which the requested relief will redress, i.e., the loss of the 1996 ANC elections as well as the unlawful dilution of their votes in that and all future elections." Pl.'s Memo. at 20.

At this stage in this case's judicial odyssey, at least two years after the term of office resulting from the 1996 elections has expired, there is no declaration or injunction that could possibly redress "the loss of the 1996 ANC elections" or the "dilution of [plaintiffs'] votes in that … election[ ]." Plaintiffs lack standing to pursue those claims because the injuries they allege cannot be redressed by the relief they seek. Thus, all that remains is plaintiffs' allegation that they will suffer the "unlawful dilution of their votes in … all future elections." This allegation, which is contained not in the complaint but in plaintiffs' brief, is insufficient to establish any of the elements of standing. Reading the complaint in the light most favorable to plaintiffs, it is utterly devoid of any allegations that would suffice to establish standing to pursue this claim. Therefore, plaintiffs' fourth claim for relief must be dismissed.

### 4. Plaintiffs' Fifth Claim for Relief

█ Plaintiffs' fifth claim for relief is based on the theory that the Board's alleged practice of destroying administrative affidavits regarding special ballots after those ballots have been counted violates 42 U.S.C. §§ 1974 and 1974a. Intervenors and defendants have moved to dismiss this claim for lack of standing: they argue that plaintiffs have failed to allege an injury-in-fact, and that the pertinent sections of federal law create no private right of action.

After examining the complaint, the court has concluded that plaintiffs have failed to allege an injury-in-fact sufficient to establish standing. Plaintiffs' sole statement regarding the injury that will allegedly result from the Board's practice is as follows: "[u]nless enjoined by this Court, the Board will continue this unlawful practice in the future to the great potential detriment of any person challenging the results of any future election." Am. Compl. ¶ 84. Plaintiffs' allegations do not demonstrate that they have suffered an injury that is "concrete and particularized" and "actual or imminent"; to the contrary, plaintiffs' allegations regarding the future "potential detriment" are, by their very terms, "conjectural or hypothetical." *Friends of the Earth, Inc.,* —— U.S. ——, ——, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000); *see also Lujan v. Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130. Furthermore, plaintiffs have not alleged that they will likely "challeng[e] the results of any future election," and they do not have standing to bring claims on behalf of others who might do so.

The court concludes that plaintiffs' fifth claim for relief must be dismissed for lack of standing.

## C. Plaintiffs' Motion for Summary Judgment

Having determined that plaintiffs' First Amended Complaint should be dismissed in its entirety, the court concludes that plaintiffs' motion for summary judgment should be denied as moot.

## IV. CONCLUSION

For the foregoing reasons, Westy Byrd's motion for reconsideration is denied, intervenors' motion to dismiss is granted, defendants' motion to dismiss is granted, and plaintiffs' motion for summary judgment is denied as it is moot.

## JUDGMENT

Pursuant to Fed.R.Civ.P. 58 and for the reasons stated by the court in its Memorandum Opinion docketed this same day, it is this 14th day of June, 2000, hereby

**ORDERED and ADJUDGED** that the complaint in this case is dismissed.